[No. F006433. Fifth Dist. Aug. 28, 1987.]

TENNECO WEST, INC., Plaintiff and Appellant, v.
COUNTY OF KERN, Defendant and Respondent;
JAMES W. MAPLES, as County Assesor, etc., Intervener and
Respondent.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of the Facts, the Introduction, and parts II-IV.

COUNSEL

Bianco, Means & McBurnie and Dominic Bianco for Plaintiff and Appellant.

B. C. Barmann, County Counsel, and Patricia J. Randolph, Deputy County Counsel, for Defendant and Respondent.

Price & Welsh and Brett L. Price for Intervener and Respondent.

OPINION

MARTIN, J.—Plaintiff oil company appeals from a judgment for defendant county and intervener assessor entered on plaintiff's complaint to recover ad valorem property taxes on certain Kern County parcels commonly known as the "Ten Section Oil and Gas field" (hereinafter Ten Section). This action followed a decision and order of the Kern County Assessment Appeals Board determining the application of Tenneco West, Inc. for reduction of assessment on gas storage rights in the property.

FACTS*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

---

* See footnote, page 596, *ante.*

DISCUSSION

*Introduction**

. . . . . . . . . . . . . . . . . . . . .

## I. DID THE ASSESSMENT APPEALS BOARD ERRONEOUSLY DETERMINE THE TAXABLE VALUE OF THE SUBJECT PROPERTIES FOR THE 1978-1979 TAX YEAR?

■ Plaintiff Tenneco contends the board failed to follow prescribed rules of law in determining the taxable value of the subject properties for tax year 1978-1979.

Tenneco specifically argues the Kern County Assessor could not reappraise the Ten Section to include a value for gas storage rights for tax year 1978-1979 under Proposition 13.

"The real property was taxed on the secured roll. Its assessment, valuation and taxation for fiscal year starting July 1, 1978 was governed by the provisions of Prop. 13 and implementing statutes.

"The constitutional provision limited the valuation and taxing powers of the Assessor, the County and the Board.

"It changed the definition of 'full cash value'. Henceforth, that value was to be the valuation shown on the 1975-76 tax bill under 'full cash value'. Thereafter a reappraisal could be had if there was a change of ownership or new construction. If the real property had not been assessed up to its full 1975 cash value it could be reassessed to reflect that valuation.

"Here there has been no change of ownership or new construction. An appraisal as of March 1, 1975 had been made. A base year value was established. . . .

"Simply stated the prescribed rules and methods limited the powers of the Board to determine a valuation which is the lesser of the factored base year value and the actual fair market value of the property. The maximum is base year value plus two percent (2%) per annum. This is so even though since 1975 it became more valuable than such 'factored base year value.' . . .

---

*See footnote, page 596, *ante.*

"The Board in its decision based its conclusion that the storage rights were subject to assessment, valuation and taxation with a 1978 base year value, on the grounds, that such rights 'were a new and separate property interests' with value that had not been assessed and taxed before. In its 'findings' it concluded that such rights were a 'separate and valuable real property' which came into existence before March 1, 1978 when tests were completed 'which established the technical and economic feasibility of the storage capacity' and hence taxable as required by Article XIII Section I [*sic*]. . . .

"The Board's reasons and conclusions are unsound. As above stated its powers of valuation have been limited by Prop. 13. The maximum allowable value is the 'factored base year value' even though since 1975 the value has increased.

"Additionally, the right to use the property as and for a storage facility is a right of use, an essential attribute of property, inherent in the [ownership] thereof. (73 C.J.S. Pg. 167; *Directors of F. I. District* v. *Abila* (1895) 106 Cal. 355, 363 [39 P. 794]; see e.g. *Tate* v. *United Fuel Gas Co.* (1952) 137 W.Va. 272 [71 S.E.2d 65, 71-72]."

California Constitution, article XIII, section 1 states: "Unless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value.

"(b) All property so assessed shall be taxed in proportion to its full value."

California Constitution, article XIII A states in relevant part: "[¶] Section 1. (a) The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on (1) any indebtedness approved by the voters prior to July 1, 1978 or (2) any bonded indebtedness for the acquisition or improvement of real

property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition.

"Section 2. (a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation. . . .

"(b) The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value."

All property in California, not exempt under the laws of the United States or of this state, is subject to taxation under the Revenue and Taxation Code. (Rev. & Tax. Code, § 201.) "Property" includes all matters and things, real, personal, and mixed, capable of private ownership. (Rev. & Tax. Code, § 103.) "Real estate" or "real property" includes: (a) the possession of, claim to, ownership of, or right to the possession of land; (b) all mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto; and (c) improvements. (Rev. & Tax. Code, § 104.)

Revenue and Taxation Code section 110 states: "Except as is otherwise provided in Section 110.1, 'full cash value' or 'fair market value' means the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes."

Revenue and Taxation Code section 110.1 states in relevant part: "(a) For purposes of subdivision (a) of Section 2 of Article XIII A of the California Constitution, 'full cash value' of real property, including possessory interests in real property, means the fair market value as determined pursuant to Section 110 for either of the following:

"(1) The 1975 lien date.

"(2) For property which is purchased, is newly constructed, or changes ownership after the 1975 lien date, either of the following:

"(A) The date on which a purchase or change in ownership occurs.

"(B) The date on which new construction is completed, and if uncompleted, on the lien date.

"(b) The value determined under subdivision (a) shall be known as the base year value for the property.

"(c) . . . Regardless of the foregoing restrictions, property that escaped taxation for 1975 and was not merely underassessed for that year, shall be added to the roll in any year in which the escape is discovered at its 1975 base year value indexed to reflect inflation as provided in subdivision (f). In determining the new base year value for that property, the assessor shall use only those factors and indicia of fair market value actually utilized in appraisals made pursuant to Section 405.5 [governing periodic reappraisals] for the 1975 lien date. The new base year values shall be consistent with the values established by reappraisal for the 1975 lien date of comparable properties which were reappraised pursuant to Section 405.5 for the fiscal year. In the event that determination is made, no escape assessment may be levied and the newly determined 'full cash value' shall be placed on the roll for the current year only; provided, however, the proceeding shall not prohibit a determination which is made prior to June 30 of a fiscal year from being reflected on the assessment roll for the current fiscal year.

"。 . . . . . . . . . . . . . . . . . . . . .

"(f) For each lien date after the lien date in which the full cash value is determined pursuant to this section, the full cash value of real property, including possessory interests in real property, shall be adjusted by an inflation factor, which shall be determined as provided in subdivision (a) of Section 51."

Every assessor shall assess all property subject to general property taxation at its full value. (Rev. & Tax. Code, § 401.) "Full value" means fair market value, full cash value, or such other value standard as is prescribed by the Constitution or in the Revenue and Taxation Code under the authorization of the Constitution. (Rev. & Tax. Code, § 110.5.) The assessor shall assess all property subject to general property taxation on the lien date as provided in articles XIII and XIII A of the Constitution and any legislative authorization thereunder. (Rev. & Tax. Code, § 401.3.)

The Revenue and Taxation Code does not expressly define or classify gas storage rights for purposes of real property taxation.[4] In the condemnation context, the Third District has held there are no true "comparables" in dealing with underground storage reservoirs: "There are relatively few such properties in the state, and those noted by the experts involved different geographical locations, temporal transactions, and physical characteristics. . . . But it is clear that underground storage properties are sui generis and that normal approaches to valuation are problematical." (*Pacific Gas & Electric Co.* v. *Zuckerman, supra* [1987], 189 Cal.App.3d 1113, 1128 [234 Cal.Rptr. 630].) Following the passage of Proposition 13, the State Board of Equalization adopted rule 468 (Cal. Admin. Code, tit. 18, § 468) to establish valuation principles for taxation of oil and gas reserves. (See *Roberts* v. *Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 799 [195 Cal.Rptr. 393].) Rule 468, set out in full in the margin,[5] retains a capitalization-of-income system

---

[4] Such rights are addressed generally in Public Resources Code section 3403.5, subdivision (a): "The Legislature finds that there are underground storage facilities for gas that utilize depleted or partially depleted oil or gas reservoirs. Purchased gas, usually from out of state, is injected for storage and withdrawn during peak load periods. The [state oil and gas] supervisor is required to maintain surveillance over these facilities to insure that the original reserves are not lost, that drilling of new wells is conducted properly, and that no damage occurs to the environment by reason of injection and withdrawal of gas."

[5] California Administrative Code, title 18, section 468 provides: "(a) The right to remove petroleum and natural gas from the earth is a taxable real property interest. Increases in recoverable amounts of minerals caused by changed physical or economic conditions constitute additions to such a property interest. Reduction in recoverable amounts of minerals caused by production or changes in the expectation of future production capabilities constitute a reduction in the interest. Whether or not physical changes to the system employed in recovering such minerals qualify as new construction shall be determined by reference to Section 463(a).

"(b) The market value of an oil and gas mineral property interest is determined by estimating the value of the volumes of proved reserves. Proved reserves are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses.

"(c) The unique nature of oil and gas property interests requires the application of specialized appraisal techniques designed to satisfy the requirements of Article XIII, Section 1, and Article XIII A, Section 2, of the California Constitution. To this end, the valuation of such properties and other real property associated therewith shall be pursuant to the following principles and procedures:

"(1) A base year value (market value) of the property shall be estimated as of lien date 1975 in accordance with Section 460.1 or as of the date a change in ownership occurs subsequent to lien date 1975. Newly constructed improvements and additions in reserves shall be valued as of the lien date of the year for which the roll is being prepared. Improvements removed from the site shall be deducted from taxable value. Base year values shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and

of valuation based upon proved reserves. However, it modifies the prior assessment practice in important aspects. Essentially, the rule treats additions to proved reserves due to changed physical or economic conditions as additions to the real property interest. These reserves are valued as of the time they first become proved reserves, and are thereafter "frozen" in value, subject only to the 2 percent inflationary increase permitted by article XIII A. In practice, at each annual reassessment the value of the oil and gas interest is reduced by depletions from the prior year's production, adjusted for the 2 percent inflationary increase, and increased by the current value of the new proved reserves. The additions to the proved reserves are thereafter "frozen" in value pursuant to article XIII A. (*Lynch* v. *State Bd. of Equalization, supra* [1985], 164 Cal.App.3d 94, 109-110 [210 Cal.Rptr. 335].) Rule 468 values the proved reserves when they are included within the property interest and thereafter gives the taxpayer the benefit of article XIII A, but

---

other mineral-producing properties and the production therefrom. Once determined, a base year value may be increased no more than two percent per year.

"(2) Base year reserve values must be adjusted annually for the value of depleted reserves caused by production or changes in the expectation of future production.

"(3) Additions to reserves established in a given year by discovery, construction of improvements, or changes in economic conditions shall be quantified and appraised at market value.

"(4) The current year's lien date taxable value of mineral reserves shall be calculated as follows:

"(A) The total unit market value and the volume of reserves using current market data shall be estimated.

"(B) The current value of taxable reserves is determined by segregating the value of wells, casings, and parts thereof, land (other than mineral rights) and improvements from the property unit value by an allocation based on the value of such properties.

"(C) The volume of new reserves shall be determined by subtracting the prior year's reserves, less depletions, from the estimated current total reserves.

"(D) The value of removed reserves shall be calculated by multiplying the volume of the reserves removed in the prior year by the weighted average value, for reserves only, per unit of minerals for all prior base years. The prior year's taxable value of the reserves remaining from prior years shall be found by subtracting the value of removed reserves from the prior year's taxable value.

"(E) The new reserves are valued by multiplying the new volume by the current market value per unit of the total reserves.

"(F) The current taxable value for reserves only is the sum of the value of the prior year's reserves, net of depletions as calculated in (D) above, factored by the appropriate percentage change in the Consumer Price Index (CPI) added to the value of the new reserves, as calculated in (E) above.

"(5) Valuation of land (other than mineral reserves) and improvements.

"(A) A base year value (market value) of land (including wells, casings and parts thereof) and improvements shall be estimated as of lien date 1975 in accordance with Section 460.1, the date of new construction after 1975, or the date a change of ownership occurs subsequent to lien date 1975.

"(B) The value of land (wells, casings and parts thereof) and improvements shall remain at their factored base year value except as provided in (6) below.

"(6) Value declines shall be recognized when the market value of the appraisal unit, i.e., land, improvements and reserves, is less than the current taxable value base of the same unit."

does not blindly ignore the fact that additions to the proved reserves are additions to the property right. In doing so, the rule gives oil and gas producers the benefits of the tax relief article XIII A was enacted to provide. At the same time the rule permits the taxable value of oil and gas properties to be increased due to additions to the proved reserves. (*Id.* at pp. 116-117.)

Although the *Lynch* court upheld the validity of rule 468, plaintiff contends *Lynch* is inapposite and rule 468 inapplicable to the instant case. Tenneco maintains it did not realize an increased return prior to 1980 and did not benefit from the "discovery" of the adaptability of the property for gas storage purposes until the sale to Southern California Gas was consummated in 1980. Plaintiff concludes: "Neither logic nor precedent supports the conclusion that storage rights are similar to the right to produce oil and gas. One is the right to store property in or on the real property. The other is a right to enter upon the real property and to produce and remove oil and gas.

"Insofar as the owner of the real property is concerned if he leases or grants the storage rights his return is fixed as of the date of the lease or grant. He neither gains nor loses by any future economic or technological conditions. The owner who grants to another the right to enter upon the real property to explore for, produce and remove oil and gas is paid a royalty based on the quantity produced. The amount of his return is affected by future conditions, economic or technological."

Defendant county and intervener assessor contend (1) gas storage rights constitute a valuable taxable real property interest; (2) an assessor need not assess gas storage rights until such rights attain value; (3) gas storage rights attain value upon the occurrence of a confluence of factors, including proper physical characteristics of the property (size, location, reservoir characteristics, deliverability, injectivity, permeability, state of depletion, and other similar factors), available technology (such as mechanical ability to utilize a field for injection and delivery of gas), and acceptable economics (gas price, costs of operation, gas supply and demand and peak delivery needs); (4) the Kern County Assessor had not determined a base year value for the gas storage rights in the Ten Section properties prior to 1978; (5) the record establishes the confluence of requisite factors occurred prior to the 1978 lien date and was demonstrated by the willingness of the utilities to pay in excess of $23.5 million for the Ten Section properties; and (6) gas storage rights are substantially the same as oil and gas production rights, are similarly affected by changes in economics and technology, and should be taxed similarly.

Shell Oil's March 1, 1956, oil and gas lease with Tenneco's predecessor, Kern County Land Company, excluded the right to warehouse or store gas or any other hydrocarbon in any subsurface formation underlying the Ten Section properties. Therefore, Tenneco was the owner of the subsurface rights, as successor to Kern County Land Company, and was subject to taxation as authorized by law. (See *Costa Mesa Union Sch. Dist.* v. *Security First Nat. Bk.* (1967) 254 Cal.App.2d 4, 14 [62 Cal.Rptr. 113]; Rev. & Tax. Code, § 405, subd. (a).) All of the parties implicitly concede there is no express constitutional, statutory, administrative, or judicial authority governing the assessment of subsurface gas storage rights. Further, all of the parties acknowledge such rights have value. However, plaintiff Tenneco contends (1) a gas storage right is a right of use, an essential attribute of property, inherent in the ownership thereof; (2) such a right could only be assessed up to its full cash value as shown on the 1975-1976 tax bills for the Ten Section properties; and (3) prior to June 3, 1980, there was no change of ownership of the storage rights as to trigger a reassessment under Proposition 13.

The history of State Board of Equalization rule 468 (Cal. Admin. Code, tit. 18, § 468) is instructive on this point. The Legislature did not address the treatment of oil and gas properties after the enactment of Proposition 13. The state board rule was a compromise rejecting both the annual valuation at full cash value and the retention of the 1975 base value year until a change in ownership of the mineral rights. In adopting rule 468, the State Board of Equalization applied 1975 base values to "proven reserves" and current values to "additions to reserves." (Ehrman & Flavin, Taxing California Property (2d ed. 1986 supp.) § 20.10, p. 98.) The instant case involves a variation of that approach. The Kern County Assessment Appeals Board and Kern County Superior Court applied 1975 base values to mineral rights in the Ten Section and current values to additions to those rights, e.g., newly discovered gas storage rights in the Ten Section. Plaintiff Tenneco essentially contends the storage rights were not newly discovered since they are an essential attribute of and inherent in the ownership of the Ten Section property. However, Tenneco erroneously assumes the subsurface reservoir underlying the Ten Section is just as suitable for storage of natural gas as the subsurface reservoir underlying any other parcel of real property. If that were true, the utilities' extensive study and testing of the Ten Section field would have been unnecessary. The evidence in this case establishes a confluence of factors must occur before the subsurface reservoir may be used for gas storage, i.e., before gas storage rights have value. These factors include proper physical characteristics of the property (including size, location, reservoir characteristics, deliverability, injectivity, permeability, state of depletion and other similar factors), available technology (the mechanical ability to use the field for the injection and delivery of natural gas), and

acceptable economics (including the natural gas price, costs of operation, gas supply and demand, and peak delivery needs).

As the intervener properly notes, the evidence demonstrates a confluence of these requisite factors had occurred as of March 1, 1978. The utilities, Southern California Gas, Pacific Lighting Service Company, and Pacific Gas and Electric Company, determined in the early 1970's additional gas storage rights would be required for their operations. Southern California Gas vice-president Norman Hawes testified at the assessment appeals hearing that demand was increasing on a regular basis but supply was remaining somewhat static or diminishing. As a result, in 1975 Southern California Gas commenced intensive studies in relation to the Ten Section properties. In July 1976 the parties entered into the temporary agreement providing for injection of natural gas and for other work on the field to determine the feasibility of a gas storage project. In spring 1976, the utilities completed their study with positive results. In fall 1976, the utilities entered into serious negotiations with the oil companies to acquire the Ten Section properties. During 1977, the utilities entered into binding written agreements with Shell Oil and plaintiff Tenneco for the sale of their interests in the Ten Section properties. The utilities agreed to pay substantially in excess of $23.5 million for the Ten Section property.

These facts establish the convergence of requisite factors occurred prior to the 1978 lien date. This is particularly true where the utilities were willing to spend a large sum of money to acquire such rights. As the intervener notes: "Certainly they [the utilities] would not have done so if they were of no value. Given these facts there can be little doubt that the gas storage rights had attained value and were taxable as of 1978." Plaintiff Tenneco contends these rights could not be taxed as of 1978 because they were included in the 1975 base year value. However, the evidence presented at the assessment appeals board hearing established the assessor did not appraise or assess the gas storage rights prior to the 1978-1979 tax year, presumably because the convergence of necessary factors had not yet occurred, at least to the knowledge of the intervener. Whether this convergence had in fact occurred but knowledge thereof was suppressed and not disclosed by plaintiff and its successors, the record does not disclose. Harold Bertholf, a consulting appraiser to the Kern County Assessor, specifically testified he had reviewed the available documentation and appraisals of the Ten Section for the years preceding 1978 and none of such appraisals included an assessment of the gas storage rights. His testimony established the first appraisal or assessment of such rights occurred in 1978. Plaintiff's *exhibit Nos.* E through I-1, consisting of appraisals and cash flows applicable to several tax years between 1975 and 1978, disclosed no appraisal of the gas storage rights. Edrick Moynier, senior appraiser in the natural resources

section of the Kern County Assessor's office, testified in relation to plaintiff's exhibit Nos. I and I-1. According to Moynier, he did not value or intend to include gas storage rights in his assessment of the Ten Section property. Thus, the gas storage rights were valued and assessed in the year of their discovery (by intervener) just as "[a]dditions to reserves established in a given year by discovery . . . shall be quantified and appraised at market value." (Cal. Admin. Code, tit. 18, § 468, subd. (c)(3).) In adopting rule 468, the Board of Equalization balanced the requirements of Proposition 13 and the unique requirements of oil and gas interests by requiring such additions to property be taxed in the year in which they attain value and are discovered, which then becomes the base year value for all future assessments of such rights and interests. Defendant county and intervener assessor have taken the foregoing position in the instant case and both the assessment appeals board and the superior court have upheld that position.

In *Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d 94, the Third District Court of Appeal held (1) Proposition 13 was applicable to oil and gas properties; (2) rule 468 was a correct interpretation of Proposition 13 as applied to oil and gas properties; and (3) rule 468 did not violate principles of due process and equal protection. In reaching these conclusions, the court stated: "It is apparent that the disjointed application of article XIII A [of the California Constitution] to oil and gas interests is one of the imprecise and ambiguous particulars of the measure referred to by the court in *Amador, supra,* 22 Cal.3d at page 245. Because of that misfit, article XIII A must be construed in a liberal, practical, and common sense manner to meet changed conditions and the growing needs of the people. (22 Cal.3d at p. 245.) Although enactments must ordinarily be construed in accordance with the plain and ordinary meaning of their words, the literal language of the measure may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. (*Ibid.*) And, importantly, it is subject to legislative and administrative interpretation and those interpretations are entitled to great weight from the courts. (*Id.* at p. 246.)

"Our review of all of the factors presented leads us to conclude that rule 468 is an appropriate interpretation of article XIII A as it relates to oil and gas interests. Such interests simply have no real parallel with other types of real property." (*Id.* at pp. 114-115.)

As the assessor notes, although rule 468 does not specifically discuss gas storage rights, the assessment of such rights is substantially similar to the assessment of oil and gas producing rights. Both involve the subsurface use of property and both are dependent upon a confluence of physical, technological and economic operating conditions. Gas storage rights become valuable only when the physical characteristics of the reservoir and the available

technology permit the injection, storage, and delivery of gas in an economic manner. As in the case of oil and gas producing rights, each of these factors is in a constant state of flux affecting both the value of the rights and their use or development. Gas storage rights which have no value may attain great value, or the opposite. In view of the disjointed application of article XIII A to oil and gas interests, the unique nature of such interests, and the analogous guidelines of State Board of Equalization rule 468, the Kern County Assessor properly recognized and valued the gas storage rights upon the lien date following their discovery and/or disclosure. Thus, the assessment was lawful and the judgment of the Kern County Superior Court sustaining the decision and order of the Kern County Assessment Appeals Board is affirmed.

### II-IV*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed. Defendant county and intervener assessor to recover their costs on appeal.

Franson, Acting P. J., and Best, J., concurred.

---

*See footnote, page 596, *ante*.