[No. A051302. First Dist., Div. Three. Apr. 27, 1993.]

PHILLIPS PETROLEUM COMPANY, Plaintiff and Appellant, v. COUNTY OF LAKE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, Rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, V, VI, VIII and IX.

## COUNSEL

C. Stephen Davis for Plaintiff and Appellant.

Cameron L. Reeves, County Counsel, and Anita L. Grant, Deputy County Counsel, for Defendant and Appellant.

## OPINION

MERRILL, J.—On June 30, 1976, Aminoil, Inc. (Aminoil), acquired the rights, as lessee under a geothermal lease, to drill for and produce geothermal steam from certain lands located in what is known as "The Geysers" area of Lake and Sonoma Counties, with the ultimate purpose of converting the steam to commercially valuable electric power. In October 1984 Phillips Petroleum Company (Phillips) acquired Aminoil and became the successor-in-interest to these rights. Between 1983 and 1987, Aminoil and Phillips filed five successive complaints against the County of Lake (County) seeking partial recovery of property taxes assessed against their "geothermal interests" during the tax years 1978-1984. These actions were consolidated below. The primary contention in these actions is that the County's method of assessment is in violation of article XIII A of the California Constitution (Proposition 13). Following a court trial, the superior court agreed and awarded Phillips a tax refund in the amount of $3,611,569.88 plus $1,393,534.21 in interest and $3,137.08 in costs. The County appeals from the judgment. Phillips appeals from a postjudgment order, dated December 6, 1991, denying its motion for attorney fees and fixing prejudgment interest. We affirm both the judgment and the order.[1]

### BACKGROUND

Prior to discussing the particular facts of this case, some background information on geothermal energy and the issues raised herein is in order.[2] The first drilling for steam from The Geysers area for the large scale generation of electrical power began in the late 1950's. (See *Pariani v. State of California* (1980) 105 Cal.App.3d 923, 926-928 [164 Cal.Rptr. 683].)

Geothermal energy originates from the heat of the earth's interior which is composed of exceedingly hot molten rock known as "magma." In some areas, usually where volcanic activity has recently occurred, the magma is relatively close to the surface. The magma is covered with a cool, solid crust of rock. This layer of rock is heavily fractured and folded by millions of years of seismic and volcanic events. These fractures and folds serve to trap water sources in contact with the heat conducted from the magma body. The

---

[1] Our ruling affirming the trial court's calculation of prejudgment interest is included in the unpublished portion of the opinion.

[2] Much of this information is taken from the parties' stipulated statement of facts.

intense heat from the magma transforms the water into steam which either remains locked in fractures beneath the earth's surface or, on occasion, escapes to the surface as a "fumarole" (steam vent).

In some places, large amounts of steam or hot water are trapped below the earth's surface by an impermeable rock layer to create what is known as a "geothermal reservoir." Wells drilled through the overlaying strata of rock intersect these fractures and conduct the steam to the surface which can be harnessed to generate electrical power.

A large geothermal reservoir exists in the vicinity of The Geysers, located approximately six miles south of the Clear Lake area. Wells at The Geysers produce dry steam—i.e., they produce from a vapor dominated system. Because the heat energy of the steam dissipates rapidly, the steam must be used where it is discovered and cannot be transported.

As in the case of oil and natural gas, geothermal resources are considered finite given the fact that they are not naturally recharged through surface or ground water sources. Geothermal resources may be successfully recharged through reinjection of steam condensate, but generally the mass of reinjected condensate is far less than the total mass produced. With the exception of any recharge through reinjection of condensate, individual wells decline in delivery capability as the resource is produced. Overall reserves are considered to be depleted as production takes place.

Also comparable to oil and gas production, there are generally five phases associated with the life of a geothermal property: leasing, discovery, exploration, development and production. First, leases are obtained from property owners giving the lessee the sole and exclusive right of exploring, drilling and extracting geothermal steam and fluids from the leasehold and the right to construct necessary facilities for such operations. The leases are usually fixed term lasting approximately 10 years or for so long as steam is produced in commercial quantities. The lessee agrees to pay the lessor a royalty based upon a percentage of the gross proceeds received from the sale of the steam.

During the discovery and exploration phase, geophysicists and geologists determine the optimum location to drill exploratory wells. Access roads and pads are constructed to accommodate the drilling equipment and exploratory wells may be drilled to a depth of 10,000 feet or more in search of productive thermal fluids. The estimated potential of the resource is determined by exploring the leasehold with the drill. As with oil and gas properties, the quantity and value of geothermal reserves are estimated even before they are fully explored or developed. Development occurs only if it

appears that there are sufficient energy reserves to make it economically attractive and if the lessee obtains necessary regulatory approval.

The development phase consists of the drilling of wells, installation of steam gathering lines, a generation plant, electrical transmission lines, condensate reinjection system and hydrogen sulfide abatement systems. In some instances, the owner and developer of the geothermal interests is also the developer and operator of the associated generating plant. Where this is not the case, negotiations are commenced with a steam purchaser such as Pacific Gas and Electric Utility Company (PG&E) for the construction of such a plant and the sale of the steam. Since steam cannot be transported over long distances, power plants are typically constructed on or near the property overlying the geothermal resource. Only after the steam producer demonstrates that it can develop enough steam to operate a generating plant for the duration of its life span, usually 30 years, and has secured the requisite regulatory approvals, will the steam purchaser proceed with construction of the plant.

■ Geothermal resources are considered mineral resources under the law. (*Pariani* v. *State of California, supra,* 105 Cal.App.3d 923; *Geothermal Kinetics, Inc.* v. *Union Oil Co.* (1977) 75 Cal.App.3d 56 [141 Cal.Rptr. 879].) ■ The interests of a lessee under a mineral lease are somewhat difficult to define. It is said that the lessee does not have the exclusive right to possession and enjoyment of the property. Rather, it has the right to extract minerals from the property and to reduce them to personal property. All other rights in the land, including surface uses, are retained by the landowner. (*Howard* v. *County of Amador* (1990) 220 Cal.App.3d 962, 972 [269 Cal.Rptr. 807].) ■ Regardless of the term of the lease, the interest created thereunder is one in real property in the nature of a profit a prendre, which is an incorporeal hereditament. An incorporeal hereditament is an inheritable right stemming from corporeal property but which is not itself corporeal. (*Ibid.*) The right to mine and extract minerals from real property may have a value to its holder far in excess of the value of the surface uses. (*Id.,* at p. 973.)

The taxable nature of such an interest has long been settled. It is the method of valuing that interest and taxing it which is often more difficult to resolve. Unlike the value of conventional real estate (i.e., buildings and land), the value of a mineral estate is dependent upon a process of production. The property in and of itself generally has no value. It is only through the exploitation or anticipated exploitation of the lessee's rights that it acquires value.

The problem of valuation was further complicated by the voters' passage of Proposition 13 in June 1978 which added article XIII A to the state

Constitution.[3] In essence, the voter-approved measure put a 1 percent cap on the property tax rate, then "rolled back" existing real property assessments to their 1975-1976 level and, for the most part, froze them there. Thereafter, property was not to be reappraised for purposes of taxation unless it was purchased, newly constructed, or a change in ownership occurred. The initiative essentially transformed California from a current-value method of taxation to an acquisition-value system of taxation. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 236 [149 Cal.Rptr. 239, 583 P.2d 1281].)

FACTS

As previously noted, Aminoil acquired the rights under a geothermal lease to drill for and produce geothermal steam in relation to certain land in The Geysers area on June 30, 1976. This land is known collectively as "Unit 13." The county line between Lake and Sonoma Counties bisects Unit 13. The larger portion of this unit of property lies within Lake County. Over the years values were allocated as agreed upon between the two counties based on the current production capacity of the wells located in each county as of each tax lien date. The Lake County Assessor divided the portion of Unit 13 located in Lake County into eight parcels for assessment purposes, six of which were placed on the secured roll and two of which were placed on the unsecured roll.[4] Phillips became the successor-in-interest to Aminoil's rights on October 26, 1984. Phillips then sold its interests to a third party on November 22, 1985. However, it reserved the right to pursue claims for the recovery of property taxes which were paid prior to that time.

The earliest geothermal lease pertaining to Unit 13 is dated 1963. On March 23, 1973, Signal Oil and Gas Company (Signal Oil), the lessee at the time, entered into an "Agreement for the Sale and Purchase of Geothermal Steam" with PG&E. Both Signal Oil and PG&E agreed that there were sufficient reserves of steam in connection with Unit 13 to operate a power plant of 135,000 kilowatts for 30 years. Actual construction of the plant began in the fall of 1977 (approximately one year after Aminoil acquired the

---

[3]Article XIII A became effective the tax year beginning July 1, 1978. (Cal. Const., art. XIII A, § 5.)

[4]The two parcels which were placed on the unsecured roll are apparently owned by the United States government. The mineral rights acquired by Aminoil and later by Phillips include these parcels.

lease). The first delivery of steam to the plant occurred on March 6, 1980, with commercial operations beginning soon thereafter.[5]

At the time Aminoil acquired the geothermal interests, Unit 13 contained approximately 17 "completed"[6] production wells. Another four were completed by the time the power plant began commercial operations. By 1985, when Phillips sold its interests to a third party, the leasehold estate supported approximately 27 production wells.

The parties agree that geothermal interests constitute real property and are taxable as such. They further agree that these interests are comprised of two principal components: (1) the right to enter upon the property, explore for and extract geothermal steam, and (2) any leasehold improvements such as wells, pipelines and related surface facilities necessary to extract and transport geothermal steam produced from these parcels. Their disagreement is over how these interests are to be valued, particularly during the exploration and development phase of the geothermal steam project.

Aminoil's acquisition of the geothermal leasehold estate midway through the exploration and development phase is really what triggered the instant debate. Prior to the enactment of Proposition 13, the County assessor apparently would wait until a power plant commenced commercial operations before determining the existence of "proved reserves" and assessing taxes against the related geothermal estate. However, with the advent of article XIII A, a change in ownership itself became a taxable event. Accordingly, Aminoil's interests were assessed on that basis in the 1977-1978 tax year.

Phillips does not dispute the value of the property interests as determined by the assessor for that year. Rather, Phillips challenges the assessments for the remaining years in which they held these interests—i.e., the period between 1978 and 1985 (a total of seven tax years). Viewing the ongoing drilling of wells during the exploration and development phase of Unit 13 as "new construction," the County reappraised these geothermal interests (including both the geothermal reserves and the system used to recover those reserves such as wells, wellheads, pipelines and the like) at full market value until the commencement of commercial operations in 1980. It waited until the 1981-1982 tax year to assign these interests a base year value.

Phillips contends that the County's method of valuation is in violation of article XIII A. Phillips maintains that these interests should have been

---

[5]The power plant which utilizes the steam produced from Unit 13 is owned and operated by PG&E which pays property taxes referable to that facility. The plant and associated facilities are listed separately on the County's tax roll from the geothermal interests.

[6]As used here, the term "completed" means simply that drilling operations were complete.

assigned a base year value as of the time they were first acquired by Aminoil. Phillips further maintains that the concept of "new construction" triggering reappraisal under the law is inapplicable to the mineral interests themselves and is limited to the physical or tangible components of the project including the land, improvements, and the system of wells and pipelines used to recover the minerals.

## THE COUNTY'S APPEAL

### I

The principal issues as framed by the trial court are: "1. Must the interest of a lessee under a geothermal lease having proved reserves be assigned a base year value at the time such interests were acquired after March 1, 1975, and; [¶] 2. May such an interest be reappraised annually at full market value as 'new construction in progress' as the facilities to develop the resource are constructed." Before addressing these specific issues, it is necessary to review the pertinent law.

Article XIII of the state Constitution provides that "[a]ll property is taxable" and shall be assessed at the same percentage of whatever value standard is officially adopted. "The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the *full value*." (Art. XIII, § 1, subd. (a), italics added.)

Article XIII A which, as noted earlier, was added by voters in 1978, provides for a maximum 1 percent tax rate upon the full cash value of real property, except where necessary to pay prior indebtedness approved by the voters. (Art. XIII A, § 1.) Section 2, subdivision (a), the so-called "rollback" provision, states in relevant part: "The full cash value means the county assessor's valuation of real property as shown on the 1975-1976 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-1976 full cash value may be reassessed to reflect that valuation." Subdivision (b), meanwhile, provides: "*The full cash value base* may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value." (Italics added.)

Revenue and Taxation Code section 50 provides: "For purposes of base year values as determined by Section 110.1, values determined for property

which is purchased or changes ownership after the 1975 lien date shall be entered on the roll for the lien date next succeeding the date of the purchase or change in ownership. Values determined after the 1975 lien date for property which is newly constructed shall be entered on the roll for the lien date next succeeding the date of completion of the new construction. The value of new construction in progress on the lien date shall be entered on the roll as of the lien date."

Revenue and Taxation Code section 110.1 states in relevant part: "(a) For purposes of subdivision (a) of Section 2 of Article XIII A of the California Constitution, 'full cash value' of real property, including possessory interests in real property, means the fair market value . . . for either of the following:

"(1) The 1975 lien date.

"(2) For property which is purchased, is newly constructed, or changes ownership after the 1975 lien date, either of the following:

"(A) The date on which a purchase or change in ownership occurs.

"(B) The date on which new construction is completed, and if uncompleted, on the lien date.

"(b) The value determined under subdivision (a) shall be known as the base year value for the property." (Rev. & Tax. Code, § 110.1.)

Based on the pertinent law, the owner of real property has a right to have a base year value assigned to his or her property. For property which is purchased, newly constructed or changes ownership after 1975, the base year value is established as of the date of that event.

The parties acknowledge that there is nothing on the books—no laws, regulations or judicial decisions—expressly governing the assessment of geothermal interests. ▮ There is, however, rule 468 (Cal. Code Regs., tit. 18, § 468[7]) promulgated by the State Board of Equalization (State Board) in the wake of Proposition 13, establishing valuation principles for the taxation of oil and gas interests. Phillips argues that the two kinds of interests, geothermal and oil and gas, are substantially similar and, thus, that these interests should be assessed in the same fashion. (See *Tenneco West, Inc.* v. *County of Kern* (1987) 194 Cal.App.3d 596, 607 [239 Cal.Rptr.

[7]For future reference, the citation of a numbered property tax rule is a citation to the same numbered section of title 18 of the California Code of Regulations (formerly the Cal. Admin. Code).

612].)[8] On this basis, it asserts that rule 468 should be applied to the case. The trial court apparently agreed with Phillips and based its decision largely on the regulation. The County does not entirely dispute the applicability of rule 468 but maintains that if it does apply, it applies only once the geothermal project is in the production phase. The County argues that the two interests are actually different in that a geothermal project requires the building of a power plant, making the exploration and development phase of such a project longer than in the case of oil and gas.

We agree with Phillips that the two kinds of interests are substantially similar. Both geothermal interests and oil and gas interests concern subsurface minerals which are valued for their heat content and their energy-producing capabilities. Both employ the techniques of mining for retrieval of these minerals. "Each of these resources takes a very long time to form. Each is finite and depletable. None is produced in a 'pure' form, each being produced along with many of the same associated minerals." (*Pariani* v. *State of California, supra,* 105 Cal.App.3d at p. 937.) The fact that a longer exploration and development phase may be involved with one of these interests, does not alter these basic similarities. Nor does this factor alone provide a basis for assessing taxes against these interests in a different manner.[9] This court previously had occasion to comment on the similarities between the two kinds of interests. (*Geothermal Kinetics, Inc.* v. *Union Oil Co., supra,* 75 Cal.App.3d 56; see also *Howard* v. *County of Amador, supra,* 220 Cal.App.3d at p. 972, fn. 4.) Accordingly, we find rule 468 applicable and proceed with an analysis of that regulation.

The most notable thing about rule 468 is that while acknowledging that "[t]he right to remove petroleum and natural gas from the earth is a taxable real property interest" (§ 468, subd. (a)), it makes taxation of said property interest dependent on the existence of "proved reserves." The regulation states, "The market value of an oil and gas mineral property interest is determined by estimating the value of the volumes of proved reserves." (§ 468, subd. (b).) Proved reserves are defined as "those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions." (*Ibid.*) Thus, before a county

---

[8] In *Tenneco West, supra,* the court applied rule 468 to subsurface gas storage rights on the grounds that such interests are "substantially similar" to oil and gas.

[9] It would appear that the State Board has drawn a like parallel. The State Board has adopted two regulations specifically addressing the valuation of mineral interests, rules 468 and 469. Rule 468, as noted, pertains to the valuation of rights to remove petroleum and natural gas from the earth; rule 469 pertains to the rights to explore, develop and produce minerals "other than oil, gas & geothermal resources." (§ 469, subd. (a).)

assessor can tax the mineral property interest itself, there must be proved reserves.[10]

Rule 468 approaches the taxation of oil and gas interests in terms of an "appraisal unit." (§ 468, subd. (c)(6).) This unit consists of four components: proved reserves; wells, casings, and parts thereof; land (other than mineral interests); and improvements. The regulation provides that "[a] base year value (market value) of the property [i.e., appraisal unit] shall be estimated as of lien date 1975 in accordance with Section 460.1 or as of the date a change in ownership occurs subsequent to lien date 1975. . . . Base year values shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom. Once determined, a base year value may be increased no more than two percent per year." (§ 468, subd. (c)(1).)

Under rule 468, "[b]ase year reserve values must be adjusted annually for the value of depleted reserves caused by production or changes in the expectation of future production." (§ 468, subd. (c)(2).) "Additions to reserves established in a given year by discovery, construction of improvements, or changes in economic conditions shall be quantified and appraised at market value." (§ 468, subd. (c)(3).)

Calculation of the current year's lien date taxable value of mineral reserves is performed as follows under the regulation:

"(A) The total unit market value and the volume of reserves using current market data shall be estimated.

"(B) The current value of taxable reserves is determined by segregating the value of wells, casings, and parts thereof, land (other than mineral rights) and improvements from the property unit value by an allocation based on the value of such properties.

"(C) The volume of new reserves shall be determined by subtracting the prior year's reserves, less depletions, from the estimated current total reserves.

[10]Rule 468 adopts what is called a capitalization-of-income system of valuation. Under this system, once the volume of mineral reserves is established with reasonable certainty, an expected schedule of future production is determined. Future income is ascertained from this schedule through the application of both existing and projected price and cost ratios. This future income schedule is then capitalized to reduce it to present value and the total present value of expected future income is considered the taxable value for the base year.

"(D) The value of removed reserves shall be calculated by multiplying the volume of the reserves removed in the prior year by the weighted average value, for reserves only, per unit of minerals for all prior base years. The prior year's taxable value of the reserves remaining from prior years shall be found by subtracting the value of removed reserves from the prior year's taxable value.

"(E) The new reserves are valued by multiplying the new volume by the current market value per unit of the total reserves.

"(F) The current taxable value for reserves only is the sum of the value of the prior year's reserves, net of depletions as calculated in (D) above, factored by the appropriate percentage change in the Consumer Price Index (CPI) added to the value of the new reserves, as calculated in (E) above." (§ 468, subd. (c)(4).)

Rule 468 applies the concept of "new construction" to only three components of the appraisal unit: the system employed in recovering such minerals (i.e., wells, casings, and parts thereof); the land; and the improvements. (§ 468, subds. (a) and (c)(5)(A).) It is not applied to the mineral reserves themselves.

As can be seen, rule 468 accommodates the fluctuating nature of interests such as oil and gas and geothermal resources. Under the regulation, valuation of the right to extract these minerals from the ground for tax purposes begins with the establishment of proved reserves. Once such reserves are established, a base year value is assigned to the property interest. That base year value is adjusted annually to reflect the depletion of reserves (a reduction in recoverable amounts of minerals constitutes a reduction in the interest). It is also adjusted when appropriate to reflect the discovery of new reserves (increases in recoverable amounts of minerals constitute additions to the property interest). (§ 468, subd. (a).)

The validity of rule 468 as applied to oil and gas interests was upheld in *Lynch v. State Bd. of Equalization* (1985) 164 Cal.App.3d 94 [210 Cal.Rptr. 335]. Commenting on the attributes of the regulation the *Lynch* court said: "Rule 468 recognizes the essential nature of an oil and gas interest. The holder of such an interest has the right to remove oil and gas in paying quantities, and paying quantities are defined and limited by the concept of proved reserves. Additions to proved reserves are additions to the property right. [Citation.] The rule values the proved reserves when they are included within the property interest and thereafter gives the taxpayer the benefit of article XIII A, but does not blindly ignore the fact that additions to the

proved reserves are additions to the property right. In doing so the rule gives oil and gas producers the benefits of the tax relief article XIII A was enacted to provide . . . ." (*Id.*, at p. 116.)

■ Turning to the case at bench, the evidence overwhelmingly establishes the existence of proved reserves at Unit 13 as of June 1976 when Aminoil acquired the geothermal lease.[11] Thus, in keeping with rule 468, the County should have assigned these interests a base year value as of the lien date following acquisition by Aminoil.

The County bases its approach on Revenue and Taxation Code sections 70 and 71 and rule 463. These provisions define the terms "newly constructed" and "new construction" for purposes of article XIII A. Specifically, the County points to subdivision (a) of section 70 which defines new construction as "(1) [a]ny addition to real property, whether land or improvements (including fixtures), since the last lien date; and [¶] (2) [a]ny alteration of land or of any improvement (including fixtures) since the last lien date which constitutes a major rehabilitation thereof or which converts the property to a different use." (Rev. & Tax. Code, § 70, subds. (a)(1) & (a)(2).) The County additionally points to subdivision (d) of rule 463 which provides, "New construction in progress on the lien date shall be appraised at its full value on such date and each lien date thereafter until the date of completion, at which time the entire portion of property which is newly constructed shall be reappraised at its full value[;]" and subdivision (e) of that regulation which states in pertinent part, "For purposes of this section, the date of completion is the date the property or portion thereof is available for use."

Viewing a geothermal steam project as ongoing "new construction" during the exploration and development phase, the County argues that "the Assessor is required to reappraise a geothermal project including the geothermal interests therein, on each lien date while its construction is in progress. [¶] A geothermal steam project is not 'available for use' and, therefore, not completed until all of the elements thereof have been constructed and integrated so that electricity may be generated. Under Rule 463, [subdivision] (d), the geothermal steam project must be reappraised when so completed to establish a base year value. [¶] Once a base year value has been established, the value of the geothermal interests must be adjusted in accordance with the concepts of Rule 468 [citation]."

---

[11] This evidence includes the "Agreement for the Sale and Purchase of Geothermal Steam" which was entered into three years earlier by Aminoil's predecessor-in-interest, Signal Oil, and PG&E and which states very clearly that there were "proven geothermal steam reserves" at that time, sufficient in amount to operate an electric generating plant of about 135,000 kilowatts for a period of 30 years. Additional evidence includes the fact that at the time Aminoil acquired its interests, there were 17 completed production wells in place.

Based on its interpretation of these provisions, the County reappraised Unit 13 (including the steam reserves) annually at full market value during the 1978-1981 tax period. Not until the first lien date following the commencement of commercial operations of the plant (i.e., the lien date for the 1981-1982 tax year), did the assessor establish a base year value for Unit 13.

We find the County's method of valuation inherently inconsistent and violative of article XIII A and the regulations promulgated by the State Board for the implementation of that statute.

First, the County's practice of equating proved reserves with the commencement of commercial operations does not comport with the regulations drafted by the State Board. As mentioned above, rule 468 defines such reserves in terms of "reserves which geological and engineering information indicate with *reasonable certainty* to be recoverable in the future." (§ 468, subd. (b), italics added.) Rule 469 (method of valuation for all minerals except oil, gas and geothermal resources) determines reserves in a similar manner.

The County disregards the regulations in this respect and adheres to a pre-Proposition 13 view of the term. Prior to passage of the voter initiative, "proved reserves" were apparently viewed by the industry in terms of reserves which experts said were recoverable *beyond a reasonable doubt.* (See *Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d 94, 104.) In keeping with that definition, tax assessors would wait until "paying quantity" production (i.e., commercial operations) was achieved before assigning a value to the mineral interests. (*Id.,* at p. 106.)

In view of rules 468 and 469 (the only regulations specifically addressing the valuation of mineral interests in the wake of Prop. 13), it seems apparent that the State Board intended to relax the standard for determining proved reserves so that taxation of mineral interests might occur earlier than in the past. As we noted above, proved reserves were established at Unit 13 four years before the power plant began commercial operations.

Similarly, the County's application of the concept of "new construction" to the geothermal reserves themselves is not in keeping with the Revenue and Taxation Code or the State Board's regulations either. Both the code and the regulations apply this term only to those interests which are corporeal in nature—that is, land (other than mineral reserves); improvements (including fixtures as defined therein); and the physical system employed in recovering

the reserves. Nowhere is it indicated that the term applies to the mineral interests themselves.[12]

A similar method of valuation to the one used by the County here was used by the tax assessors in *Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d 94 with respect to oil and gas. In rejecting that method the *Lynch* court said: "We must also reject the arguments of the appellant assessors that annual reassessment is required for the entire interest. The precise nature of the property interest in uncaptured oil and gas beneath the surface has never been clearly defined and is subject to refinement. [Citation.] So long as California had a current-value system of property taxation it was unnecessary to define for taxation purposes the nature of the taxable interest, but when the voters enacted an acquisition system of taxation it became necessary to define more clearly the taxable interest in an oil and gas property. Rule 468 does that by recognizing that the value of an oil and gas property lies in the proved reserves. Additions to the proved reserves constitute additions to the property right, but to permit reassessment of the existing proved reserve when it becomes more valuable due to inflation would violate the terms of article XIII A. The Board thus properly determined that existing proved reserves may not be increased in value more than 2 percent per year." (*Id.,* at p. 117.)

The same reasoning applied by the *Lynch* court to the method of valuation used by tax assessors in that case with respect to oil and gas can be applied to the method of valuation employed by the County in the instant case relative to geothermal resources. In passing Proposition 13, the voters of California intended to place significant restraints on the assessment and taxing powers of state and local governments. (*County of Sonoma* v. *State Bd. of Equalization* (1987) 195 Cal.App.3d 982, 986 [241 Cal.Rptr. 215]; *Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d at p. 113.) These restraints were presumably meant to benefit commercial and business properties as well as homeowners. (*Lynch* v. *State Bd. of Equalization, supra,* at p. 113.)

II-VI*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

[12]We also note the inherent inconsistency in the County's practice of designating reserves as new construction during, but not after, the exploratory and developmental phase of the project.

*See footnote, *ante,* page 180.

PHILLIPS'S APPEAL

VII

■ Phillips appeals from a postjudgment order denying its request for attorney fees. The request was based on Revenue and Taxation Code sections 5152 and 538. We find no error in the denial of this request.

Section 5152 provides in pertinent part that "[i]n an action in which the recovery of taxes is allowed by the court, if the court finds that the void assessment or void portion of the assessment was made in violation of a specific provision of the Constitution of the State of California, of this division, or of a rule or regulation of the board, and the assessor should have followed the procedures set forth in Section 538 in lieu of making the assessment, the plaintiff shall be entitled to reasonable attorney's fees as costs in addition to the other allowable costs." The relevant part of section 538, meanwhile, states: "If the assessor believes that a specific provision of the Constitution of the State of California, of this division, or of a rule or regulation of the board is unconstitutional or invalid, and as a result thereof concludes that property should be assessed in a manner contrary to such provision, . . . the assessor shall, in lieu of making such an assessment, bring an action for declaratory relief against the board under Section 1060 of the Code of Civil Procedure." (§ 538, subd. (a).)

In denying Phillips's request, the trial court said that section 538's provision for attorney fees covers "an intentional challenge to a legislative enactment, not a simple failure to understand or properly apply the law, as occurred in this case." The court reasoned: "The mental state of the assessor is crucial. In the present case, there is nothing to indicate that the Lake County assessor made an affirmative decision to violate or disregard a particular rule or law because of a belief that the rule or law was 'incorrect.' "

Claiming that the trial court misinterpreted these statutes, Phillips argues that "a 'belief of invalidity' includes a belief that a particular provision of the law does not apply to a particular assessment regardless of the perceived legality or illegality of the regulation or statute, or a belief that a particular regulation applies to an assessment when in fact it does not." In seeking to support this erroneous position, Phillips misconstrues our holding in *Prudential Ins. Co. v. City and County of San Francisco* (1987) 191 Cal.App.3d 1142 [236 Cal.Rptr. 869].

*Prudential* was similarly an action for the refund of real property taxes. In *Prudential*, plaintiff purchased a hotel paying approximately 80 percent of the purchase price in cash and the remaining 20 percent through the assumption of a loan held by the seller. Plaintiff obtained the loan at a below the market rate. This savings was offset by the parties through a slight increase in the purchase price. In assessing taxes on the property, the assessor placed a value on the hotel based on the inflated purchase price. In doing so, the assessor disregarded rule 4 which called for the loan to be discounted to its cash equivalent. As we pointed out in *Prudential*, the assessor did not disagree in principle with the concept of discounting to cash equivalent value but did disagree with the expression of this concept in rule 4. The trial court entered judgment in favor of plaintiff. Additionally, it awarded plaintiff attorney fees pursuant to sections 5152 and 538.

On appeal, the assessor in *Prudential* argued that the award of attorney fees should be overturned because his reason for disregarding rule 4 was not that it was "unconstitutional or invalid" in the words of the statutes but that it was simply inapplicable in that case. We rejected that argument citing the assessor's testimony at trial that he disagreed with rule 4 on its face. We said, "We think this testimony provides sufficient evidence of the Assessor's belief of the invalidity of rule 4 to trigger the application of section 538. The assessor's argument that he did not disagree with rule 4 in general but only with its application to this case is unavailing. First, his testimony was that rule 4 on its face is incorrect. Second, we see no difference for purposes of section 538 whether an assessor believes a rule is unconstitutional or invalid on its face or as applied to a particular case. In either instance the result is that the property is 'assessed in a manner contrary to such provision.' " (*Prudential Ins. Co.* v. *City and County of San Francisco, supra,* 191 Cal.App.3d at pp. 1159-1160.) Thus, the opinion makes it clear that to justify an award of attorney fees it is essential that the flawed assessment result from the assessor's erroneous belief that a particular provision, rule or regulation is unconstitutional or invalid.

In the instant case, we are in agreement with the trial court's determination that an award of attorney fees was not appropriate. Our opinion in *Prudential* does not stand for the proposition, as Phillips seems to suggest, that any time an assessor fails to apply a statute or regulation because he or she believes it inapplicable when it is applicable, for whatever the reason, attorney fees are warranted. Rather, our holding underscores the importance of a factual finding by the court, as a prerequisite to an attorney fee award, that the reason the assessor did not apply a particular provision was that he or she believed it to be unconstitutional or invalid. Sections 5152 and 538 require a cognitive decision on the part of the assessor that a particular

provision, rule or regulation is unconstitutional or invalid either on its face or as applied to the circumstances in the case. In such a situation, it is reasonable to put the onus on the assessor to test his or her theory by filing an action for declaratory relief. On the other hand, when it is simply a matter of the assessor misreading or misunderstanding the applicability of a provision in general, it is not reasonable to require such action or to award fees. To rule otherwise would require an assessor in most every instance to either file a declaratory relief action or risk liability for attorney fees if an assessment proved erroneous. This would place an undue burden on our counties and was certainly not intended by the Legislature.

In the case at bar, the record supports the trial court's finding that the failure of the County to apply rule 468 was a matter of a misunderstanding of the law rather than a challenging of the validity of the provision itself. There is no indication in the record that the assessor believed rule 468 was unconstitutional or invalid. As both sides agree, article XIII A was written with conventional real property interests in mind and is conceptually different when applied to incorporeal interests such as those at issue here. Such terms as "full cash value," "base year value," and "new construction," must be redefined to a certain extent to accommodate these differences. The regulations promulgated by the State Board, such as rule 468, are an attempt to reach such accommodation. However, none of these regulations specifically addresses itself to geothermal interests. And while geothermal interests are substantially similar to oil and gas interests, there are differences between the two kinds of interests as already noted.

## VIII, IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

## X

The October 3, 1990, judgment awarding Phillips a tax refund in the amount of $3,611,569.88, and $1,393,534.21 in interest, and $3,137.08 in costs is affirmed. Additionally, the December 6, 1991, order fixing the amount of prejudgment interest, denying Phillips's request for attorney fees, and allowing costs, is affirmed. Phillips is further entitled to postjudgment

*See footnote, *ante*, page 180.

interest at the yearly rate of 7 percent per annum to be measured from October 3, 1990, the date of entry of judgment. Phillips is awarded costs on appeal.

White, P. J., and Chin, J., concurred.