[No. A100714. First Dist., Div. Three. Oct. 14, 2004.]

CENTRAL CALIFORNIA POWER AGENCY No. 1, Plaintiff and Respondent, v.
COUNTY OF SONOMA, Defendant and Appellant.

## COUNSEL

Brett Lee Price for Defendant and Appellant.

Downey, Brand, Seymour & Rohwer, Ronald Franklyn Lipp and Barbara L. Berg for Plaintiff and Respondent.

## OPINION

**CORRIGAN, J.**—The County of Sonoma (Sonoma) appeals from the judgment following a grant of summary adjudication in favor of the Central California Power Agency No. 1 (CCPA) on its complaint for refund of taxes. Sonoma contends both the State Board of Equalization (SBE) and the trial court employed an improper valuation method in applying section 11 of article XIII of the California Constitution (Section 11). We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

At issue here are the taxation rules that apply when a local governmental agency owns property outside its jurisdictional boundaries (extraterritorial property). In this case the City of Santa Clara, the Modesto Irrigation District and the Sacramento Municipal Utility District joined to form CCPA as a joint powers agency. CCPA built the Coldwater Creek Geothermal Power Plant in Sonoma County and the plant began operations in 1988.[1]

Four years later CCPA acquired leasehold interests in the Coldwater Creek Geothermal Steam Field, which provided fuel for the plant.[2] The leases were originally granted between 1967 and 1980 and were transferred several times among private companies before their acquisition by CCPA. These interests in geothermal mineral rights, along with related personalty and improvements,[3] are the property the taxation of which is contested. The County of Sonoma imposed property taxes that CCPA paid. CCPA then sought SBE review for the years 1993–1994 through 1997–1998, basing its claim for adjustment on Section 11, subdivision (g) and Revenue and Taxation Code section 1840.

Following bifurcated hearings on the 1993–1994 application, the SBE issued two separate decisions. In the first (SBE I), the Board determined that CCPA was not tax exempt but was a public agency entitled to be assessed under the provisions of Section 11. The SBE directed Sonoma to make an assessment on that basis. In SBE II, the Board decided that as a matter of law, Section 11 requires the Property to be valued at the lowest of (1) its current market value, (2) its value under article XIII A of the California Constitution (Proposition 13) [the Proposition 13 value], or (3) its restricted value as determined by the application of "the Phillips factor" to the 1967 assessed value, according to the formula prescribed by Section 11 [the Section 11 value].[4]

Relying on a methodology that included additional values for the subsequently discovered mineral reserves at issue, Sonoma had set the Section 11 value of the property at $215 million, the market value at $54 million and the Proposition 13 value at $48 million. Thus, under Sonoma's approach the Proposition 13 value was the lowest.

---

[1] Taxation of the plant itself is not at issue here.

[2] These interests were purchased in 1992 at a bankruptcy sale.

[3] The value of the improvements is not contested.

[4] See *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 559, 572 [41 Cal.Rptr.2d 888, 896 P.2d 181] (*San Francisco*) (wherein the court held that local governmental owners of extraterritorial lands are entitled to the protections of Proposition 13 when those protections support a lower value than Section 11.)

In SBE II the Board concluded that, as a matter of law, Sonoma improperly included additional value for the mineral rights in its Section 11 calculation. The rights were improperly added because a Section 11 valuation already includes all interests in land. The proper Section 11 calculation resulted in a $4.5 million figure, becoming the lowest value. The Board also applied its decision to CCPA's pending applications for tax years 1994–1995 through 1997–1998. Based on the SBE's decisions, CCPA filed a claim for refund of taxes. After the County failed to act on the claim within six months, CCPA filed a complaint in San Francisco Superior Court, naming Sonoma and the SBE as defendants,[5] and moved for summary adjudication on one of its three alternative claims for relief.[6] The court granted summary adjudication in favor of CCPA. In doing so the court noted: "Section 11 appears to balance the interests of local government agencies like CCPA with those of taxing agencies like Sonoma by valuing land at its 1967 appraised value, adjusted as necessary by the factor provided by Revenue and Tax[ation] Code 401, and multiplied by the SBE-determined 'Phillips factor' for the year in question." The court concluded that the SBE had properly determined the Section 11 value and applied that determination to the contested tax years. The court also concluded that although Sonoma had not had an opportunity to submit evidence in support of its valuations, it was not deprived of due process because valuation was decided as a matter of law, and Sonoma's method was legally incorrect. Finally, the court concluded its decision did not determine the obligations of, or grant any exemption from taxation to, any other party.

In September 1999, based on a joint motion and stipulation for entry of judgment among all the parties, the court entered its separate judgment, agreeing with the SBE regarding the appropriate methodology for calculating the Property's value under Section 11. CCPA waived certain claims and rights, and agreed to dismiss all other claims if the ruling on its primary claim was upheld.

Sonoma filed a timely notice of appeal in *Central California Power Agency No. 1 v. County of Sonoma* (Nov. 5, 1999, A089147) (nonpub. opn.), and CCPA filed a protective cross-appeal. Having raised the issue of our jurisdiction sua sponte, and having received supplemental briefing on that issue from both parties, we dismissed the purported appeal and cross-appeal for lack of a final judgment.

---

[5] Together with its answer, Sonoma filed a cross-petition for peremptory writ of administrative mandamus, contending the SBE's decisions were invalid and unenforceable.

[6] CCPA's cause of action for refund of taxes was based on three alleged grounds: (1) that the property was entirely exempt from property taxation by Sonoma County; (2) that CCPA was entitled to be assessed at the lowest of three specified values; and (3) that CCPA's purchase price for the property represented its base year value as of the date of purchase. The superior court granted summary adjudication for CCPA on the second theory.

Following issuance of the remittitur, and pursuant to the parties' subsequent joint motion and stipulation for entry of judgment in the trial court, judgment was entered against CCPA on the remaining claims in its complaint. This timely appeal followed.[7]

## DISCUSSION

Sonoma contends the SBE and the trial court misinterpreted Section 11, and failed to properly value the mineral rights at issue here. Sonoma also argues the SBE procedure deprived Sonoma of a proper evidentiary hearing, and resulted in an improper exemption from taxation for private holders of royalty rights.

### I. *Section 11 and Its History*

"Before 1914, land owned by a local government and located outside of its jurisdictional boundaries was constitutionally exempt from taxation by the local government within whose boundaries the land was located. (Former art. XIII, § 1.)" (*San Francisco, supra,* 10 Cal.4th at p. 559.) "The adverse effect on the tax bases of [counties in which urban governments had acquired lands for their water rights] led in 1914 to the amendment of article XIII, section 1 . . . to permit the taxation of land owned by local governments and located outside their jurisdictional boundaries." (*Ibid.*)

"In 1968, the California Constitution was amended by the voters to limit the maximum valuation by the taxing counties of taxable land owned by a local government and located outside of its boundaries. (Former article XIII, §§ 1.60 to 1.69.)[8] In 1974, these valuation limitations were moved to article XIII, section 11. Section 11 limits the taxation of [extraterritorial land] by restricting the maximum valuation of that land. (Art. XIII, § 11, subd. (b).)" (*San Francisco, supra,* 10 Cal.4th at p. 560.) "[Former section] 1.60 imposed

---

[7] No cross-appeal has been filed, nor is the SBE a participant in the current appeal.

[8] These lands had been "difficult to value because of their uniqueness (e.g., water rights and watershed land in the Sierra) and the lack of transactions for comparable land in the open market. [Citation]." (*San Francisco, supra,* 10 Cal.4th at p. 568.) "Moreover, populous urban local governments owning property outside their boundaries in some cases apparently came to believe that the taxing counties were overvaluing that land in order to exploit a distant deep-pocket taxpayer which had no vote in the county and which, because of the uniqueness of its land, was unlikely to sell its land and relocate. [Citation.]" (*Ibid.*) "The purpose of former article XIII, section 1.60 et seq. was to ensure that land owned by local governments and located outside their boundaries would be taxed comparably to privately owned land, both from the perspective of the local government that owned the land and from the perspective of the local government in whose taxing jurisdiction the land was located." (*Ibid.*)

valuation limitations on extraterritorial lands to prevent the taxing county from manipulating fair market value while insuring that the valuation of extraterritorial lands would continue to grow in line with the general state-wide appreciation of land values in California. [¶] Section 11, adopted by the voters in 1974, continued these principles unchanged."[9] (*San Fransico, supra,* at p. 569.)

Section 11 provides, in pertinent part: "(a) Lands owned by a local government that are outside its boundaries, including rights to use or divert water from surface or underground sources *and any other interests in lands,* are taxable if . . . (2) they are located outside Inyo or Mono County and were taxable when acquired by the local government. . . . [¶] (b) . . . Taxable land belonging to a local government and located outside of Inyo and Mono counties shall be assessed at the place where located and in an amount that does not exceed the lower of (1) its fair market value times the prevailing percentage of fair market value at which other lands are assessed and (2) a figure derived [by multiplying the 1967 assessed value by the ratio of the statewide per capita assessed value of land as of the last lien date prior to the current lien date to $856]." (Italics added.)

■ The ratio prescribed by the statute is known as "the Phillips factor," that reflects the statewide increase in land values since 1967. (*San Francisco, supra,* 10 Cal.4th at p. 561.) Justice Mosk noted in his concurrence: "As the language of the ballot argument suggests, section 11 represents an effort to reconcile the competing needs of taxed and taxing local jurisdictions." (*Id.* at p. 575.) "Section 11 represents *a constitutional compromise* based on the then-existent property tax scheme; it was, in effect, a form of *tax relief for local government entities that owned extraterritorial property.* [Citation.]" (*Id.* at p. 576, italics added.)

■ The superior court concluded the SBE had correctly determined the Section 11 value of the Property by multiplying the 1967 assessment by the Phillips factor, and adding the value of improvements.[10] Sonoma protests that

---

[9] In 1974, Proposition 8 revised article XIII to "clarif[y] wording, eliminate[] excess verbiage, and establish[] a logical order for the article's provisions." (Ballot. Pamp., Gen. Elec. (Nov. 5, 1974), analysis by Legis. Analyst of Prop. 8, p. 30.) The Legislative Analyst further stated: "The proposed amendment will have a minor effect, if any, on state and local costs and revenues." (*Ibid.*) The argument in favor of Proposition 8 stated: "The purpose of this amendment is not to make a change in our present tax structure, but to make the Constitution more readable and workable." (*Id.* at p. 31.) No argument against the proposition was submitted.

[10] The SBE noted CCPA "used the 1967–68 cash value of $63,409 as set forth on the assessor's roll, multiplied that value by .25 (the assessment ratio then in effect) to obtain the 1967 assessed value, and multiplied that value by the Phillips factor to obtain a Section 11

this interpretation "effectively exempts the entirety of [CCPA's] interest from taxation" because only surface grazing rights, but not the mineral rights were assessed in 1967. The argument fails. The use to which the Property may have been put in 1967 does not affect the Section 11 valuation, because that section specifically applies to *all* interests in property.

The legislative history of Section 11 and its predecessors supports the conclusions of the SBE and the superior court.[11] Proponents of Proposition 2, which implemented the Phillips factor calculation, argued: "This amendment continues the taxation of these publicly-owned lands, but sets up a state-wide formula so their assessed valuation will increase at a similar rate to the general increase in property values throughout the State—an estimated 5 per cent each year." (Ballot Pamp., Proposed Amends. to Const. with arguments to the voters, Gen. Elec. (Nov. 5, 1968) p. 7 (hereafter 1968 Ballot Pamphlet).) Proponents also noted: "Disagreement on the amount of the assessed value of such lands and water rights, against which taxes ap. 7re levied, has resulted in prolonged and costly court battles between public agencies. This situation should not continue. [¶] The Legislature, representing all areas, has developed a reasonable assessment formula which they feel will be fair to everyone." (*Ibid.*) Opponents of Proposition 2, on the other hand, warned: "It provides for an assessment formula which greatly benefits the large governmental agencies while it discriminates against the local taxpayer. [¶] Lands owned by public agencies and held in another county, would be assessed at a lower value than similar properties in that other county." (*Ibid.*) The tax rate "will be locked into the Constitution and cannot be more than the assessed value for 196[7] lien date, factored upwards by a very conservative formula which strongly favors big city utilities." (*Id.* at p. 8.)

The Legislative Counsel's analysis states that Proposition 2 "would establish, with respect to property assessed under the formula, a conclusive presumption that the land is assessable and taxable at the same situs and that *no other interests in such lands* shall thereafter be assessed to the governmental owner." (1968 Ballot Pamp., *supra*, at p. 6, italics added.) As these references reflect, the voters had before them the essence of Sonoma's position here. Passage of the initiative reflects a rejection of the County's argument. While we may or may not disagree with the wisdom of the People's decision, we are not empowered to disregard it. Sonoma contends Sections 1.60 through 1.69 are no longer applicable because they were

---

restricted value of land in the amount of $404,025. The value of the improvements was then added to the value of land for a total value of $4,499,370." (Fns. omitted.)

[11] See *Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 772 [35 Cal.Rptr.2d 814, 884 P.2d 645], which confirms that courts may consult ballot arguments of constitutional amendments for indicia of voter intent.

replaced by Section 11. However, our Supreme Court has noted that "Section 11 . . . continued the[] principles [enunciated by those former sections] unchanged." (*San Francisco, supra*, 10 Cal.4th at p. 569.) The conclusions of the SBE and the superior court are also consistent with the general principle that "[t]he exemption for public property is liberally construed because taxing such property is the exception rather than the rule; public property is taxed only if there is express authority to do so. [Citations.]" (*Sacramento Mun. Utility Dist. v. County of Sonoma* (1991) 235 Cal.App.3d 726, 732 [1 Cal.Rptr.2d 99].)

Sonoma argues that the purpose and intent of Section 11 is to protect host counties from the loss of tax revenues caused by the acquisition of property by other governmental entities, such as CCPA. The older cases cited by Sonoma interpreted the purpose of the 1914 amendment, however, which had replaced a policy of complete exemption of such property. (See *City & Co. of S.F. v. County of San Mateo* (1950) 36 Cal.2d 196, 200 [222 P.2d 860] [fill that raised level of land for use as an airport constituted improvement exempt from tax under 1914 amendment]; *San Francisco v. County of Alameda* (1936) 5 Cal.2d 243, 247 [54 P.2d 462] [water rights included in lands taxable under 1914 amendment].) Those cases were decided before the 1968 amendment effected by the passage of Proposition 2, which altered extraterritorial taxation by adding a specific formula to limit the value of such land, tied to its 1967 value, while balancing the interests of the governmental landowner and the taxing county. As Ehrman and Flavin point out, the result of the 1968 amendment limits the amount of increases permitted in county assessments: "Land value assessment increases are permitted only in the ratio that the per capita value of land, statewide, has increased over the 1967 value." (1 Ehrman & Flavin, Taxing Cal. Property (3d ed. 1997) § 6:11, pp. 19–20, fn. omitted.)

## II.  *Proposition 13 and Section 11*

In *San Francisco, supra*, 10 Cal.4th at page 568, the court considered the separate question of whether an irreconcilable conflict between the valuation limitations imposed by Proposition 13 and Section 11 precluded their concurrent operation. In reviewing the history of Section 11, the court noted: "Section 1.60 imposed valuation limitations on extraterritorial lands to prevent the taxing county from manipulating fair market value while insuring that the valuation of extraterritorial lands would continue to grow in line with the general statewide appreciation of land values in California. [¶] Section 11, adopted by the voters in 1974, continued these principles unchanged." (*Id.* at p. 569.) The court further reasoned: "Section 11 continued the purpose of

ensuring comparable taxation of extraterritorial lands and privately owned real property. Significantly, a local government's extraterritorial lands could never be valued higher under [S]ection 11 than those same lands would be valued if owned by a private landowner." (*Ibid.*) The court concluded it was consistent with the purposes of both Proposition 13 and Section 11 to apply Proposition 13 to extraterritorial lands owned by local governments, and that a refusal to do so "would be contrary to [S]ection 11's purpose of ensuring that a local government's extraterritorial lands not be valued greater than the same lands would be valued if owned by a private landowner." (*Id.* at p. 570.) The *San Francisco* case did not address the issue before us here, namely, the effect of subsequently established mineral reserves on a Section 11 valuation. The decision did, however, clearly contemplate that the Section 11 value could be lower than the Proposition 13 value.

(3) The other cases on which Sonoma relies involve the validity and application of administrative rules governing the valuation of mineral interests for purposes of Proposition 13, and are, thus, distinguishable. (See *Lynch v. State Bd. of Equalization* (1985) 164 Cal.App.3d 94 [210 Cal.Rptr. 335] (*Lynch*); *Tenneco West, Inc. v. County of Kern* (1987) 194 Cal.App.3d 596 [239 Cal.Rptr. 612]; *Phillips Petroleum Co. v. County of Lake* (1993) 15 Cal.App.4th 180 [18 Cal.Rptr.2d 765].) None of these cases involved a local governmental entity as the taxpayer; therefore, none triggered the provisions of Section 11. In contending these cases are nevertheless analogous, and that mineral rights should be taxed when they are discovered or attain value under Section 11 just as they are under Proposition 13, Sonoma fails to acknowledge important differences between the underlying purposes and approaches of the two separate taxation systems. Under Proposition 13, property is valued when it is acquired, and the SBE has established rules to determine when an interest is deemed "acquired" for purposes of assessment and taxation.[12] (See *Lynch, supra,* 164 Cal.App.3d at pp. 113–115.) But Section 11 takes a different approach to property owned by local governmental agencies, valuing all interests in land as of 1967 and adjusting their assessed value for each subsequent year by the Phillips factor. The legislation implementing Proposition 13 provides: "Notwithstanding the provisions of this division, property subject to valuation pursuant to Section 11 . . . shall be valued for property tax purposes *in accordance with such section.*" (Rev. & Tax. Code, § 52, subd. (d), italics added.)[13] The implementing legislation itself distinguishes Proposition 13 from Section 11. This express distinction eliminates the Proposition 13 analysis urged by the dissent. The application of

---

[12] Under Proposition 13, "[a]ll real property is valued when it is purchased, newly constructed, or a change of ownership occurs." (*Lynch, supra,* 164 Cal.App.3d at p. 113.)

[13] We note that unlike Proposition 13, Section 11 makes no provision for adjusting assessed values when property "is purchased, newly constructed, or a change of ownership occurs." (Cf. *Lynch, supra,* 164 Cal.App.3d at p. 113.)

administrative rules promulgated pursuant to Proposition 13 would be inappropriate in determining the proper valuation because such an application would result in Proposition 13 effectively repealing Section 11. This result is clearly inimical to Proposition 13's own implementing legislation.

The dissent reviews the *Phillips* and *Lynch* discussions of geothermal interests in some detail. It fails to note a critical distinction, however. Neither of those cases involved a governmental entity and, thus, Section 11 was in no way implicated in them. As the dissent points out, the Supreme Court acknowledged at least as early as 1909 that oil and gas rights may justifiably be treated differently from other leasehold interests. Thus, that principle was firmly established by 1974 when the electorate enacted Section 11. The particular taxation system then enacted could have made an exception for subsequently emerging value based on oil, gas or geothermal discovery or production, but it did not. Instead, the clear language of Section 11 refers to the right to use or divert water or "any other interests in lands."[14]

Sonoma, dissatisfied with the system that was adopted to balance the competing needs of government tax recipients and taxpayers, seeks to have us rewrite the law to invalidate the compromise enacted by the People. The People are free to do so. In the absence of authority or necessity not present here, we will not.

■ The essence of the dissent's position is that the electorate could have adopted a system that is both different and "better." The first premise is certainly true and the second may be. But that choice belongs to, and remains with, the electorate. As judges we are not empowered to substitute our views of what the law *should* be for the People's pronouncement of what the law *is*. When subordinate laws violate the Constitution, or when the People's disparate legal articulations require reconciliation, we may intervene to harmonize various of the People's enactments. Neither situation is present here.

### III. *Other Issues*

Sonoma also contends the SBE erred in applying its decision to subsequent tax years without holding separate hearings for each year. As the superior court observed, Sonoma has failed to point to any injury resulting from the Board's approach, or to any factual or legal distinction among the years at

---

[14] We note that when the predecessor to Section 11 was passed in 1968, the similar language "any interest in lands" was used.

issue.[15] Sonoma's argument that it was deprived of a proper evidentiary hearing is similarly unpersuasive. The questions at issue were matters of law involving the proper application of Section 11 to Sonoma's own valuation data. Because CCPA met its burden to show that valuation could be established as a matter of law, the full evidentiary hearing Sonoma sought was unnecessary. Nor did the litigation establish the tax liability of any public or private entity not a party to the proceedings.[16]

In its opening brief, Sonoma also asserts in passing that the first installment of CCPA's 1993–1994 taxes was paid more than four years before its claim for refund was filed, and that payment is therefore not subject to refund under Revenue and Taxation Code sections 5097, subdivision (a)(2) and 5142. CCPA responds that the payment in question was for unsecured taxes on personal property for which no refund was sought under the claim here at issue.[17] CCPA's position was accepted by the trial court, and Sonoma has not demonstrated error in this regard.[18]

## DISPOSITION

The judgment is affirmed.

McGuiness, P. J., concurred.

**POLLAK, J.,** Dissenting.—Unlike the majority, I agree with the County of Sonoma (Sonoma) that both the State Board of Equalization (SBE) and the trial court misconstrued section 11 of article XIII of the California Constitution (Section 11) in undervaluing the interest of the Central California Power Agency No. 1 (CCPA) in certain leases and subleases entitling CCPA to extract geothermal energy from property located in Sonoma County. Contrary

---

[15] Sonoma's reliance on *International Medication Systems, Inc. v. Assessment Appeals Bd.* (1997) 57 Cal.App.4th 761, 767 [67 Cal.Rptr.2d 394], is misplaced. That case involved a failure to give proper notice under Revenue and Taxation Code section 1605.6 to a taxpayer whose application for reduction of tax assessment had been denied.

[16] In fact, SBE may have marginally overvalued CCPA's interests by including all property interests associated with the Property. CCPA has agreed not to dispute that matter, however, and Sonoma is the beneficiary of any overvaluation in that regard. The allocation of taxable interests to other owners who may be separately assessed by Sonoma is not at issue here.

[17] The record indicates the payment in question, for approximately $4000, was made on August 25, 1993.

[18] Sonoma does not mention the issue again in its reply brief. Further, the record indicates the first installment on the secured assessments of the Property, totaling approximately $275,000, was paid in December 1993, less than four years before the claim for refund was filed. We do not address Sonoma's argument, raised for the first time in its reply brief, that the SBE erred in including in its calculation of the Section 11 value of the Property a factor of .25 under former Revenue and Taxation Code section 401.

to the characterization of my views in the majority opinion, my disagreement is not based on the contention that "the electorate could have adopted a system that is both different and 'better.' " (Maj. opn., *ante*, p. 1623.) Rather, I submit that the construction that the majority feels constrained to place on the oblique provisions of Section 11 produces a result that was never intended by anyone and unnecessarily frustrates the will of the electorate.

As the majority opinion explains, CCPA is a California joint powers agency, a public entity whose members include the City of Santa Clara, the Modesto Irrigation District, and the Sacramento Municipal Utility District. CCPA constructed the Coldwater Creek Geothermal Power Plant in Sonoma, which began operation in 1988. In 1992, CCPA acquired in a bankruptcy sale certain leases (and subleases) in nearby property sometimes referred to as the Coldwater Creek Geothermal Steam Field property, or simply the Steamfield property. All of this property lies within the Geysers Geothermal Field, title to some of which is held by a private party (Wild Horse Ranch, Inc.) and some of which is held by the State of California.[1] These leases entitle CCPA to gain access, explore, develop and exploit subsurface geothermal reserves which provide fuel for CCPA's power plant. These geothermal mineral rights (and related improvements),[2] have been assessed and taxed by Sonoma. CCPA filed applications for review, equalization or adjustment of its property taxes with the SBE for tax years 1993–1994 through 1997–1998, pursuant to Section 11 subdivision (g) and Revenue and Taxation Code section 1840. Following bifurcated hearings on the 1993–1994 application, the SBE issued two separate decisions. In the first, the SBE rejected CCPA's claim that it was tax exempt but concluded that it was a public agency entitled to be assessed under the provisions of Section 11, and directed Sonoma to make such an assessment. In its second decision, with which we are here concerned, the SBE decided that as a matter of law, Section 11 in conjunction with article XIII A of the California Constitution (sometimes referred to as Proposition 13), requires CCPA's mineral rights to be valued at the lowest of (1) its current market value, (2) its restricted value as determined by the application of "the Phillips factor" to the 1967 assessed value of the land, and (3) its value under Proposition 13. (See *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 559, 572 [41 Cal.Rptr.2d 888, 896 P.2d 181] (*San Francisco*).) Sonoma determined that the restricted value derived by using the Phillips factor was $215 million and that the formula under

---

[1] The first of the leases was obtained by Signal Oil and Gas from the predecessors to Wild Horse Ranch, Inc., in 1967. In 1976 the leases were transferred to Burmah Oil & Gas Co. In 1977, the leases were retransferred to Aminoil USA, which in the same year acquired additional leases from the State of California. Aminoil USA in turn transferred the leases to Geothermal Resources International (GEO) in 1983. GEO filed bankruptcy proceedings in 1990 and in 1992 CCPA purchased the leases from GEO in a bankruptcy sale.

[2] As the majority states, although included in the same assessments, the value of improvements is not at issue since CCPA has stipulated to the values used by Sonoma.

Proposition 13 produced the lowest value of $48 million, upon which it based its assessment.[3] The SBE used a different methodology for calculating the restricted value based on the Phillips factor, and concluded that this method produced the lowest valuation, approximately $4.5 million, of which only $404,025 was the value for the land. SBE directed that the assessment be corrected accordingly and applied its decision to CCPA's pending applications for tax years 1993–1994 through 1997–1998. CCPA then filed a claim for refund of taxes for these tax years. After Sonoma failed to act on the claim within six months, CCPA filed a complaint in San Francisco Superior Court, naming Sonoma and the SBE as defendants. Sonoma answered and filed a cross-petition for a peremptory writ of mandate, challenging the validity of SBE's decisions on numerous grounds[4] and seeking, among other things, to have the matter remanded to the SBE for an evidentiary hearing based upon the correct legal standard. CCPA then filed a motion for summary adjudication on one of its three alternative claims for relief[5] and the superior court subsequently entered an order granting summary adjudication in favor of CCPA. The court concluded that the SBE had properly determined the Section 11 value of the mineral rights for 1993–1994, and had properly applied that valuation decision to the later tax years of 1994–1995 through 1997–1998. Judgment ultimately was entered in favor of CCPA on its first alternative claim for a refund and against Sonoma on its petition for a writ of mandate.

Sonoma contends the SBE and the trial court misinterpreted Section 11, and therefore failed to value properly the mineral interests at issue here. In order to evaluate this contention it is necessary to begin with a clear understanding of both the provisions of Section 11 and the unique nature of the property interests that are being valued.

### Section 11

"Before 1914, land owned by a local government and located outside of its jurisdictional boundaries was constitutionally exempt from taxation by the local government within whose boundaries the land was located. (Former art. XIII, § 1.)" (*San Francisco, supra*, 10 Cal.4th at p. 559.) "The adverse effect on the tax bases of [counties in which urban governments had acquired lands for their water rights] led in 1914 to the amendment of article XIII, section 1

---

[3] Sonoma's appraiser also determined that the 1992 market value was $54 million.

[4] Among them, Sonoma alleged that the SBE "arbitrarily, improperly and erroneously misinterpreted and misapplied section 11 in such a manner as to exempt a substantial portion of the Property from taxation, disregard the historical assessments relating to the Property, and disregard the nature and value of the Property when it was discovered and attained value through a confluence of economic, technical and physical factors."

[5] See majority opinion, *ante*, at page 1617, footnote 6.

. . . to permit the taxation of land owned by local governments and located outside their jurisdictional boundaries." (*Ibid.*)

"In 1968, the California Constitution was amended by the voters to limit the maximum valuation by the taxing counties of taxable land owned by a local government and located outside its boundaries. (Former article XIII, §§ 1.60 to 1.69.) In 1974, these valuation limitations were moved to article XIII, section 11. Section 11 limits the taxation of taxable land owned by a local government and located outside its jurisdictional boundaries (hereafter sometimes referred to as extraterritorial land) by restricting the maximum valuation of that land. (Art. XIII, § 11, subd. (b).)" (*San Francisco, supra,* 10 Cal.4th at p. 560.) "[Former section] 1.60 imposed valuation limitations on extraterritorial lands to prevent the taxing county from manipulating fair market value while insuring that the valuation of extraterritorial lands would continue to grow in line with the general statewide appreciation of land values in California. [¶] Section 11, adopted by the voters in 1974, continued these principles unchanged." (*San Francisco, supra,* at p. 569.)

Section 11 provides, in pertinent part: "(a) Lands owned by a local government that are outside its boundaries, including rights to use or divert water from surface or underground sources and any other interests in lands, are taxable if . . . (2) they are located outside Inyo or Mono County and were taxable when acquired by the local government. . . . [¶] (b) . . . Taxable land belonging to a local government and located outside of Inyo and Mono counties shall be assessed at the place where located and in an amount that does not exceed the lower of (1) its fair market value times the prevailing percentage of fair market value at which other lands are assessed and (2) a figure derived [by multiplying the 1967 assessed value by the ratio of the statewide per capita assessed value of land as of the last lien date prior to the current lien date to $856]."[6]

---

[6] Section 11, subdivisions (a) and (b) provide in full as follows:

"(a) Lands owned by a local government that are outside its boundaries, including rights to use or divert water from surface or underground sources and any other interests in lands, are taxable if (1) they are located in Inyo or Mono County and (a) they were assessed for taxation to the local government in Inyo County as of the 1966 lien date, or in Mono County as of the 1967 lien date, whether or not the assessment was valid when made, or (b) they were acquired by the local government subsequent to that lien date and were assessed to a prior owner as of that lien date and each lien date thereafter, or (2) they are located outside Inyo or Mono County and were taxable when acquired by the local government. Improvements owned by a local government that are outside its boundaries are taxable if they were taxable when acquired or were constructed by the local government to replace improvements which were taxable when acquired.

"(b) Taxable land belonging to a local government and located in Inyo County shall be assessed in any year subsequent to 1968 at the place where it was assessed as of the 1966 lien date and in an amount derived by multiplying its 1966 assessed value by the ratio of the statewide per capita assessed value of land as of the last lien date prior to the current lien date

The ratio prescribed by the statute is known as "the Phillips factor, and it reflects the statewide increase in land values since 1967." (*San Francisco, supra,* 10 Cal.4th at p. 561.) "As the language of the ballot argument suggests, section 11 represents an effort to reconcile the competing needs of taxed and taxing local jurisdictions." (*San Francisco, supra,* at p. 575.) "Section 11 represents a constitutional compromise based on the then-existent property tax scheme; it was, in effect, a form of tax relief for local government entities that owned extraterritorial property." (*San Francisco, supra,* at p. 576.)

### *Geothermal mineral rights*

The nature of geothermal energy was considered in a 1993 decision from this court involving the taxation of geothermal leasehold interests located in the same geothermal field as the property involved in this case. (*Phillips Petroleum Co. v. County of Lake* (1993) 15 Cal.App.4th 180, 183–185 [18 Cal.Rptr.2d 765] (*Phillips*); see also *Geothermal Kinetics, Inc. v. Union Oil of California* (1977) 75 Cal.App.3d 56 [141 Cal.Rptr. 879]; *Pariani v. State of California* (1980) 105 Cal.App.3d 923 [164 Cal.Rptr. 683]; see generally Bjorge, *The Development of Geothermal Resources and the 1970 Geothermal Steam Act—Law in Search of Definition* (1974) 46 U. Colo. L.Rev. 1 (Bjorge).) *Phillips* recognized that geothermal interests are substantially similar to oil and gas interests, and should be assessed in the same manner. "Both geothermal interests and oil and gas interests concern subsurface minerals which are valued for their heat content and their energy-producing capabilities. Both employ the techniques of mining for retrieval of these minerals. 'Each of these resources takes a very long time to form. Each is finite and depletable. None is produced in a "pure" form, each being produced along with many of the same associated minerals.' " (*Phillips, supra,* at p. 190.) A thorough description of the nature of oil and gas rights is,

---

to $766, using civilian population only. Taxable land belonging to a local government and located in Mono County shall be assessed in any year subsequent to 1968 at the place where it was assessed as of the 1967 lien date and in an amount determined by the preceding formula except that the 1967 lien date, the 1967 assessed value, and the figure $856 shall be used in the formula. Taxable land belonging to a local government and located outside of Inyo and Mono counties shall be assessed at the place where located and in an amount that does not exceed the lower of (1) its fair market value times the prevailing percentage of fair market value at which other lands are assessed and (2) a figure derived in the manner specified in this Section for land located in Mono County. [¶] If land acquired by a local government after the lien date of the base year specified in this Section was assessed in the base year as part of a larger parcel, the assessed value of the part in the base year shall be that fraction of the assessed value of the larger parcel that the area of the part is of the area of the larger parcel. [¶] If a local government divests itself of ownership of land without water rights and this land was assessed in Inyo County as of the 1966 lien date or in Mono County as of the 1967 lien date, the divestment shall not diminish the quantity of water rights assessable and taxable at the place where assessed as of that lien date."

in turn, set out in *Lynch v. State Bd. of Equalization* (1985) 164 Cal.App.3d 94, 99–105 [210 Cal.Rptr. 335] (*Lynch*).

Both *Lynch* and *Phillips* addressed the application of Proposition 13 to the respective property interests involved in those cases. (See also *Tenneco West, Inc. v. County of Kern* (1987) 194 Cal.App.3d 596 [239 Cal.Rptr. 612] (*Tenneco West*) [gas storage rights].) These cases began their analysis with the recognition that such interests are "truly *sui generis*," in large part because they "first became economically significant at a time when our basic notions of property had already crystallized." (*Lynch, supra,* 164 Cal.App.3d at pp. 98–99; see also, e.g., *Callahan v. Martin* (1935) 3 Cal.2d 110, 115 [43 P.2d 788].) Quoting from a 1940 decision of the United States Supreme Court, *Lynch* recognized that "oil and gas interests are by their very nature unique, and the attempt to classify them in legal terms presents 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures [and courts].' " (*Lynch, supra,* at p. 99.) Yet, "[w]hile the interests of a lessee under an oil and gas lease are difficult to define, it has long been recognized that they are interests in real property and are subject to real property taxation." (*Id.* at p. 103.) *Lynch* pointed out that as far back as 1909, the California Supreme Court had "held that the mining rights and privileges of the lessee should be separately assessed to the lessee." (*Ibid.*; see *Graciosa Oil Co. v. Santa Barbara* (1909) 155 Cal. 140, 99 P. 483 (*Graciosa*).)

In *Graciosa,* the Supreme Court explained the justification for treating leases conferring the right to extract oil and gas differently from ordinary leasehold interests. "It is no doubt the general rule, regarding land held under an ordinary lease for years giving the right to hold the land for usufructory purposes only, that, in the absence of contrary statutory provisions, there is to be but one assessment of the entire estate in the land, and that this assessment should include the value of both the estate for years and of the remainder or reversion." (*Graciosa, supra,* 155 Cal. at p. 143.) Yet, "[t]here are material differences between such estates for years and the right and privilege to bore for and extract oil, held by the plaintiff under its oil lease." (*Id.* at p. 144.) "The right of the lessee under [an oil lease] is more than that of the ordinary lessee. It is of a different character and for a different purpose. [The lessee] has no right at all to the usufruct of the soil. His right extends to the extraction of a certain part of the substance of the land itself, to its permanent separation and removal and its conversion to his own use. The whole object of the contract is to effect, if not technically a sale and conveyance of a substantial and specific part of the land, at least a disposition and transfer thereof to another." (*Id.* at p. 145.) Under article XIII, section 1 of the California Constitution, which for present purposes remains unchanged to this

day,[7] the rights of the lessee under such a lease "are private property and are taxable in some form. . . . The property rights thus vested in [the lessee] belong to it and not to its lessor." (*Graciosa, supra,* at pp. 145–146.) *Graciosa* thus upheld the separate assessment of the property rights held under an oil lease. "If the rights and privileges of the miner upon such lands are not taxable to the person in possession, they would entirely escape taxation." (*Id.* at p. 147.)[8]

*Lynch* extended this reasoning in determining how Proposition 13 should be applied to oil and gas leases. *Lynch* explained the inherent valuation problems that arise from the fact that there are "three separate phases in the life of an oil and gas producing property"—"discovery, development, and production" (and these phases may be subdivided even further). (*Lynch, supra,* 164 Cal.App.3d at pp. 100, 102.) Valuation is particularly difficult because the leases become valuable only on development and then for a variety of reasons are subject to frequent fluctuations in value. (*Id.* at pp. 103–105.) The uniqueness of these interests, the court explained, led to common use of a method of valuation based on the concept of "proved reserves," predicated on estimates of existing, but variable, economic and operating conditions. (*Id.* at p. 104.) "It is apparent that 'proved reserves' are not synonymous with the oil in place." (*Ibid.*) What is particularly significant for present purposes is that under this method, "tax assessors typically placed either a zero or a nominal value on oil and gas properties during the

---

[7] This section provides in part today, "Unless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value." (Cal. Const., art. 13, § 1, as amended Nov. 5, 1974.) As amended November 6, 1894, this section began, "All property in the State, not exempt under the laws of the United States shall be taxed in proportion to its value, to be ascertained as provided by law."

[8] The majority argues that because mineral rights were recognized to be separately taxable as early as 1909, when the electorate subsequently adopted Section 11 the measure "could have made an exception for subsequently emerging value based on oil, gas or geothermal discovery or production, but it did not." (Maj. opn., *ante,* at p. 1623.) What the majority overlooks is that in *Graciosa* the only issue was whether mineral rights were subject to separate taxation; no consideration was given to the point in time at which such rights become taxable. Before the early 1940's, "the cases were in conflict, the character of rights to subsurface oil was unclear and assessors could therefore reasonably treat the lessor as the owner of his share of the oil and gas in the ground." (*Atlantic Oil Co. v. County of Los Angeles* (1968) 69 Cal.2d 585, 596, fn. 10 [72 Cal.Rptr. 886, 446 P.2d 1006].) The concept that, unlike other property, these rights do not become taxable property until there are proved reserves was not unequivocally adopted as part of California tax law until 1966, when the Assessment Standards Division of the Property Tax Department of the California State Board of Equalization published a manual entitled Valuation of Oil and Gas Producing Properties. (*Lynch, supra,* 164 Cal.App.3d at p. 104.) It was not until 1977 that the right to extract geothermal energy was held to be a mineral. (*Geothermal Kinetics, Inc. v. Union Oil of California, supra,* 75 Cal.App.3d 56; see also *Pariani v. State of California, supra,* 105 Cal.App.3d 923; Bjorge, *supra,* 46 U. Colo. L.Rev. 1.)

discovery and development stages of the field's life." (*Id.* at pp. 105–106.) That is, the leasehold interest was not treated as having any taxable value until the oil field went into production, when there were proved reserves.

Proposition 13 converted California from "a current-value method of taxation to an acquisition-value system of taxation." (*Lynch, supra,* 164 Cal.App.3d at p. 113.) Under this constitutional amendment real property must be assessed at its valuation in the 1975–1976 base year or when it is subsequently transferred or newly constructed, plus an inflationary factor not to exceed 2 percent a year. (*Id.* at pp. 108, 113.) In *Lynch,* assessors argued that due to the unique nature of oil and gas mineral rights and the virtual absence of any reference to such rights in the pre-election discussion of Proposition 13, the proposition should not be construed to refer to such interests. The court rejected this contention, observing that "[a]rguments cannot supply what is missing from the language of the measure, and this court is not at liberty to add provisions to the Constitution. [Citations.] However wise we may believe such an exception to be, we cannot carve it out from article XIII A unless there is an affirmative indication of voter intent or language in the measure itself which is reasonably susceptible of such a meaning. Here we find neither." (*Lynch, supra,* at p. 112.)

Nonetheless, the court refused to construe Proposition 13 literally to mean that the valuation of oil and gas leasehold interests not transferred subsequent to the 1975–1976 base year must be determined by their base year assessment. "Although enactments must ordinarily be construed in accordance with the plain and ordinary meaning of their words, the literal language of the measure may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers." (*Lynch, supra,* 164 Cal.App.3d at p. 114.) There, the court explained: "The acceptance of the position of the oil and gas appellants in this case would lead to manifestly absurd and unintended results. Since these interests generally have no value when initially acquired and are typically assessed at a zero or nominal value during the discovery and development process, the application of article XIII A in the manner sought by the oil and gas interests would preclude real property taxation on any oil and gas interest created after the 1975 assessment, as well as on any interest which had not been developed to 'paying quantities' prior to that year." (*Lynch, supra,* at p. 115.) The court pointed out that Proposition 13 "was intended to provide broad property tax relief, but it was not intended to exempt particular taxpayers from property tax." (*Lynch, supra,* at p. 116.) Adopting such a literal construction, the court pointed out, would violate article XIII, section 1, subdivision (a), which provides that " '[a]ll property is taxable.' " (*Lynch, supra,* at p. 116.) The court emphasized that "due to the unique nature of oil and gas interests, those property rights cannot be treated in a manner identical to other types of property" (*id.* at p. 117) and upheld the validity of rule 468 of the SBE, California Code of Regulations, title 18,

section 468 (rule 468). Under rule 468, proved reserves (the standard for establishing which was lowered) that did not exist in the 1975–1976 base year are valued as of the date they are established and additions to or deletions from those reserves are valued as of the year in which they occur. "The rule values the proved reserves when they are included within the property interest and thereafter gives the taxpayer the benefit of article XIII A, but does not blindly ignore the fact that additions to the proved reserves are additions to the property right. In doing so the rule gives oil and gas producers the benefits of the tax relief article XIII A was enacted to provide without reaching the absurd results we have described." (*Lynch, supra,* at p. 116; see *Phillips, supra,* 15 Cal.App.4th at pp. 192–195.)

As noted above, in *Phillips* the court recognized the substantial similarity between geothermal resources and oil and gas. "[C]omparable to oil and gas production, there are generally five phases associated with the life of a geothermal property: leasing, discovery, exploration, development and production." (*Phillips, supra,* 15 Cal.App.4th at p. 184.) The court also recognized that the rights to drill for and produce geothermal steam under a geothermal lease are substantially similar to the rights acquired under an oil and gas lease. (*Id.* at p. 190.) The court observed that "[t]he most notable thing about rule 468 is that while acknowledging that '[t]he right to remove petroleum and natural gas from the earth is a taxable real property interest' (§ 468, subd. (a)), it makes taxation of said property interest dependent on the existence of 'proved reserves' " (*Phillips, supra,* at p. 190) and upheld the application of rule 468 to a geothermal lease. Subsequent to the decision in *Phillips,* the SBE adopted a new rule 473 that explicitly applies to the valuation and taxation of geothermal properties essentially the same methodology as prescribed under rule 468.

In *Tenneco West,* the holder of the right to store gas under the surface of certain real property contended that a gas storage right is simply an essential attribute of property ownership, so that under the plain language of Proposition 13 the right could be assessed based on its value only as of the 1975–1976 base period, not as of the date when the storage right was deemed to attain value. The holder of the gas storage rights argued that "these rights could not be taxed as of 1978 because they were included in the 1975 base year value." (*Tenneco West, supra,* 194 Cal.App.4th at p. 606.) Nonetheless, acknowledging the absence of any "express constitutional, statutory, administrative, or judicial authority governing the assessment of subsurface gas storage rights" (*id.* at p. 605) and relying heavily on the reasoning of *Lynch,* the court upheld the application of rule 468 to the valuation of those rights. "As the assessor notes," the court stated, "although rule 468 does not specifically discuss gas storage rights, the assessment of such rights is substantially similar to the assessment of oil and gas producing rights. Both involve the subsurface use of property and both are dependent upon a

confluence of physical, technological and economic operating conditions. Gas storage rights become valuable only when the physical characteristics of the reservoir and the available technology permit the injection, storage, and delivery of gas in an economic manner. As in the case of oil and gas producing rights, each of these factors is in a constant state of flux affecting both the value of the rights and their use or development." (*Tenneco West, supra,* at pp. 607–608.)

Thus, *Lynch, Phillips,* and *Tenneco West* each recognize that the right to extract vagrant minerals (or store them subsurface) is a distinct and taxable interest in real property, and that because of the unique nature of such an interest, applying the literal language of Proposition 13 to its valuation would produce the "absurd" and unintended result of virtually eliminating its taxability, contrary to the long-standing and fundamental constitutional edict that all property be taxable. (Cal. Const., art. XIII, § 1, subd. (a).) Instead, these cases uphold the approach taken by the SBE in rule 468, which retains but modifies the prior capitalization-of-income system based upon proved reserves, valuing these mineral reserves only when they first become proved reserves and thereafter giving the taxpayer the benefit of "freezing" the value as prescribed in Proposition 13. (*Tenneco West, supra,* 194 Cal.App.3d at pp. 603–604.)

### *Application of Section 11 to Geothermal Mineral Rights*

In the view of CCPA, adopted by the SBE, the trial court, and now the majority of this court, the Section 11 value of its leasehold interests is properly determined by multiplying the 1967 assessment of the parcels on which the mineral leases were granted by the Phillips factor, and adding the value of improvements. The SBE agreed with CCPA that "the meaning of Section 11 is plain on its face"—the section states that "taxable land" belonging to a local government located in another county shall be assessed at the lower of (1) its fair market value times the prevailing assessment percentage and (2) its 1967 assessed value times the Phillips factor. The SBE further agreed that land is "broadly defined in property tax law" to include mineral reserves, including unproved reserves. Therefore, "whether or not the mineral reserves were proved in 1967, the 1967 assessed value attributed to the Steamfield property in 1967 included the value of the mineral reserves." In light of article III, section 3.5 of the California Constitution, which prohibits an administrative agency from refusing to enforce a statute before an appellate court has determined it to be unconstitutional, the SBE concluded that it "must enforce section 11 as it is explicitly written and adopted unless there is an appellate court case authorizing a different interpretation."

SBE's analysis is wrong both as a matter of fact and as a matter of logic. Factually, it is incorrect to state that the 1967 assessments of the Steamfield property parcels "included the value of the mineral reserves." They did not. As indicated above, the leasehold right to extract oil and gas and geothermal energy has never been valued for taxation purposes during the discovery, exploration or development phases. (*Lynch, supra,* 164 Cal.App.3d at pp. 103–104.) The existing SBE regulations carry forward the long-standing rule that "valuation of the right to extract these minerals from the ground for tax purposes begins with the establishment of proved reserves." (*Phillips, supra,* 15 Cal.App.4th at p. 192.) When as the result of exploration and development the existence of proved reserves is established, the taxable interest that thereby arises is given a separate parcel number and is assessed and taxed separately from the parcel itself. By statute, this interest must be placed on the secured rather than the unsecured property roll, unlike other taxable interests in land. (Rev. & Tax. Code, § 107;[9] *Lynch, supra,* 164 Cal.App.3d at p. 103.)

Mineral rights have long been regarded as an interest in land. (*Phillips, supra,* 15 Cal.App.4th at p. 185; *Lynch, supra,* 164 Cal.App.3d at p. 102; Cal. Code Regs., tit. 18, § 121 ["Land consists of the possession of, claim to, ownership of, or right to possession of land; mines, quarries, and unextracted mineral products"].) But because of the "fugacious, vagrant nature of oil and other hydrocarbon substances" (*Callahan v. Martin, supra,* 3 Cal.2d at p. 117), the mere fact that such minerals underlie a particular parcel of land does not mean that the owner of the parcel will ever be able to realize their value. Among other uncertainties, these "fugative" minerals may be developed and extracted from neighboring property. In therefore rejecting the view that these mineral rights are the equivalent of title to the minerals, the Supreme Court has explained that "the owner of land does not have an absolute title to oil and gas in place as corporeal real property, but, rather, the exclusive right on his premises to drill for oil and gas, and to retain as his property all substances brought to the surface on his land." (*Ibid.*; see *Phillips, supra,* 15 Cal.App.4th at p. 185; *Lynch, supra,* 164 Cal.App.3d at p. 102.) This is the basic reason these mineral rights are not regarded as taxable property until there are proved reserves. (See *Lynch, supra,* at pp. 102–105.)

Because of this fundamental difference in the nature of these rights and other interests in land, it is far from clear whether the term "taxable land" as

---

[9] Revenue and Taxation Code section 107 provides, as here relevant: "Leasehold estates for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth, and other rights relating to these substances which constitute incorporeal hereditaments or profits a prendre, are sufficient security for the payment of taxes levied thereon. These estates and rights *shall not be classified as possessory interests,* but shall be placed on the secured roll." (Italics added.)

it appears in Section 11, subdivision (b) includes geothermal mineral reserves that were unproved as of 1967. Since the reserves were not then taxable, it is a strained construction to consider them as "taxable land." At a minimum, there is a significant ambiguity in the language of the provision. And, in all events, the right to extract such minerals certainly is not the same as ownership of the minerals or the right to occupy the land. These interests may be "as distinct and separate as is the ownership of respective owners of two adjoining tracts of land." (*Graciosa, supra*, 155 Cal. at p. 144.) Even if such a right is construed as "taxable land" within the meaning of Section 11, subdivision (b), it is not the same taxable land as the surface parcels that were assessed in 1967. In 1967, there was no right to extract proved reserves of geothermal energy from the Steamfield property; at the time there was no such taxable land in existence.

The issue thus presented in interpreting Section 11 is whether, in providing that the alternative valuation method that must be used in assessing extraterritorial taxable land, if it produces the lower assessment, is the product of the Phillips factor times the 1967 assessed value of the land, it was intended that the Phillips factor be multiplied by zero—effectively removing the property from the tax roll—if no such taxable land existed in 1967. Or, is it more reasonable to read Section 11 as the courts have read Proposition 13—to imply that if the taxable property right did not exist in 1967, the Phillips factor should be applied to the value of the mineral rights when proved reserves are first established? The former construction of Section 11 defeats its purpose and produces an absurd result that should not be countenanced, whereas the latter interpretation protects all of the conflicting interests that Section 11 was intended to balance and safeguard.

Before explaining why this is so, it is helpful to note that this issue is not necessarily limited to vagrant mineral rights. Normally one thinks of land as something permanent, at least for most human purposes if not from a geological perspective. While it is not unusual to think of new interests being created in existing real property, it is somewhat foreign to think of land that exists today but did not exist 40 years ago. This conventional thinking may well explain why the history of Section 11 reflects no consideration having been given to how the Phillips factor should be applied to real property coming into existence after 1967. (See dis. opn., *ante*, at p. 1630, fn. 8.) But consider the creation of new land with landfill.[10] Suppose, hypothetically, that

---

[10] According to the current SBE regulations, "Where there is a reshaping of land or an adding to land itself, that portion of the property relating to the reshaping or adding to the land is land." (Cal. Code Regs., tit. 18, § 121.) The regulation goes on to define an improvement. Much of the litigation that has arisen concerning the taxability of landfill deals with the

in 2004, by this means a private party creates a new island in a body of water within the jurisdiction of a particular county (perhaps constructing a structure upon it as well), subjecting the real property to taxation by the county for the first time. If the property were then conveyed to an outside governmental agency, what would the impact of Section 11 be on the right of the county to tax the property? If CCPA's position is correct, and the majority opinion stands, no tax could be imposed.

Section 11 as it now reads was placed in the California Constitution to reconcile and protect two conflicting concerns. The initial provision removing the exemption of extraterritorial property from taxation was adopted in 1914 to protect the tax base of counties in which outside governmental agencies chose to purchase property. "The undoubted purpose of the amendment was primarily to safeguard the tax revenues of smaller counties wherein large municipal corporations had purchased, or would acquire, extensive holdings and which would, except for the amendment, be exempt from local taxation. With the exemption in force, the serious financial embarrassment of the counties in which the holdings were situated was a reality. The argument sent to the electors of the state when the amendment was proposed also discloses that, unless the amendment be adopted, impending disaster would result to smaller counties by the removal from the local tax rolls of lands and water rights acquired and to be utilized in connection with the acquisition or extension of municipal water supplies such as were then in progress by the City and County of San Francisco and the City of Los Angeles. The adoption of the amendment was evidence that the acquisition of such lands and water rights should be without prejudice to the outlying counties whose existence from an economic and governmental standpoint depended upon the tax revenues derived therefrom." (*San Francisco v. County of Alameda* (1936) 5 Cal.2d 243, 245–246.)

"Prior to the amendment property acquired by outside municipalities had no place on the tax rolls of the county in which it was situated. It was readily appreciated that a continuation of the policy of complete exemption might impoverish counties extensively invaded by outside municipalities seeking acquisition of property for public use. A partial retention of the taxing power of the county as to such acquired property was therefore devised. The county was empowered to assess 'such lands and the improvements thereon' . . . 'as were subject to taxation at the time of the acquisition' of the same by the city. . . . The obvious purpose was to permit the assessment of *the property which was in existence at the time it was acquired by the city.*" (*City and Co.*

---

distinction between land and improvements, an issue that is of no concern in the present case. (E.g., *City and Co. of S. F. v. County of San Mateo* (1950) 36 Cal.2d 196 [222 P.2d 860]; *San Pedro etc. R.R. Co. v. Los Angeles* (1919) 180 Cal. 18 [179 P. 393].)

*of S. F. v. County of San Mateo, supra,* 36 Cal.2d at pp. 199–200, italics added.)[11]

The Constitution was again amended in 1968 to correct what was perceived as a countervailing abuse by the counties in which extraterritorial property was located. These lands had been "difficult to value because of their uniqueness (e.g., water rights and watershed land in the Sierra) and the lack of transactions for comparable land in the open market." (*San Francisco, supra,* 10 Cal.4th at p. 568.) "[P]opulous urban local governments owning property outside their boundaries in some cases apparently came to believe that the taxing counties were overvaluing that land in order to exploit a distant deep-pocket taxpayer which had no vote in the county and which, because of the uniqueness of its land, was unlikely to sell its land and relocate. [Citation.] [¶] The purpose of [the 1968 amendment] was to ensure that land owned by local governments and located outside their boundaries would be taxed comparably to privately owned land, both from the perspective of the local government that owned the land and from the perspective of the local government in whose taxing jurisdiction the land was located." (*Ibid.*)

A ballot argument in support of the 1968 amendment explained that the purpose of the measure was twofold: " 'This measure will assure continuance of an adequate tax base related to these lands. It will also assure public agencies owning the property that their citizens will not bear more than an equitable share of taxes levied in the taxing counties.' " (*San Francisco, supra,* 10 Cal.4th at pp. 568–569, citing Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to the voters, Gen. Elec. (Nov. 5, 1968) argument of Sen. Moscone in favor of Prop. 2, p. 7.) The California Supreme Court has summarized the dual objectives of the 1968 amendments as "impos[ing] valuation limitations on extraterritorial lands to prevent the taxing county from manipulating fair market value while insuring that the valuation of extraterritorial lands would continue to grow in line with the general statewide appreciation of land values in California." (*San Fransico, supra,* 10 Cal.4th at p. 569.)

When the language of the constitutional provision was simplified in 1974 with the adoption of Section 11, the basic principles and objectives of the measure were unchanged. "Section 11 continued the purpose of ensuring comparable taxation of extraterritorial lands and privately owned real property. Significantly, a local government's extraterritorial lands could never be valued higher under section 11 than those same lands would be valued

---

[11] In that case, the court held that the extension with fill of the San Francisco airport located in San Mateo County constituted the construction of an improvement by San Francisco, which remains within the constitutional tax exemption.

if owned by a private landowner." (*San Francisco, supra,* 10 Cal.4th at p. 539; see also 1 Ehrman & Flavin, Taxing Cal. Property (3d ed. 1997) § 6:11,pp. 19–20; *id.* (2003 supp.) § 6:11, pp. 114–115.) Nowhere in the history of this constitutional provision, however, is there any indication that the measure was intended to preclude the taxation of mineral rights that initially were taxable in the hands of a private party but subsequently were transferred to an outside governmental agency, simply because such rights were not taxable in 1967.[12]

In fact, the text of Section 11 contains a persuasive indication that the provision was not so intended. Section 1.60, subdivision (b) of the 1968 amendment provided: "Any said lands acquired subsequent to the lien date in 1967 which were assessed on said date as part of a larger tax parcel, shall be assessed as hereinabove provided, by fixing the assessed value therefor on the lien date in 1967 as the proportion of the assessment of said parcel on said date determined by *the ratio of the area of any said lands to the area of the tax parcel of which they were a part* on said date." (Ballot Pamp., Gen. Elec. (Nov. 5, 1968) text of Prop. 2, § 1.60, subd. (b), p. 27, italics added.) The substance of this provision was carried forward into Section 11 as follows: "If

---

[12] The 1968 version did contain language that may be argued to support such an intention, but on closer analysis does not. Section 1.62 of the 1968 amendment read in part that any lands owned by a governmental entity "not assessed on the lien date in 1967 shall not thereafter be subject to taxation while so owned. Any said lands acquired subsequent to the lien date in 1967 which were not assessed on said date and each lien date thereafter shall not be subject to taxation while so owned." Accordingly, the detailed analysis of the measure that appeared in the 1968 ballot pamphlet stated, "The measure would establish, with respect to property assessed under the formula, a conclusive presumption that the land is assessable and taxable at the same situs and that no other interests in such lands shall thereafter be assessed to the governmental owner. If such lands were not assessed in . . . 1967 . . . they would thereafter be exempt while so owned." (Ballot Pamp., Gen. Elec. (Nov. 5, 1968) text of Prop. 2, § 1.62, p. 28; *id.,* analysis by Legis. Counsel, p. 6.) Nowhere in the preelection materials has the court's research found any indication that these statements were made with any reference to or consideration of an interest entitling the holder to extract subsurface minerals not yet cognizable in 1967. Moreover, these particular provisions were not carried forward into Section 11. Section 11 was adopted as part of Proposition 8 on the 1974 ballot, and was one of numerous revisions designed to "clarif[y] wording, eliminate[] excess verbiage, and establish[] a logical order for" provisions appearing in seven articles of the Constitution concerning taxation generally. (Ballot. Pamp., Gen. Elec. (Nov. 5, 1974) analysis by Legis. Analyst of Prop. 8, p. 30.) The argument in favor of Proposition 8 stated: "The purpose of this amendment is not to make a change in our present tax structure, but to make the Constitution more readable and workable." (*Id.* at p. 31.) In citing this language from the ballot pamphlet, our Supreme Court recognized that Section 11 "continued [the] principles [of the 1968 measure] unchanged," but it did not suggest that omitted specifics were nonetheless to be considered as remaining in effect. (*San Francisco, supra,* 10 Cal.4th at p. 569.) Still further, as explained in the following paragraph of the text above, section 1.60, subdivision (b) of the 1968 amendment, which was carried forward into Section 11, provides a contrary and far more telling indication that the 1968 constitutional provision was not intended to preclude the separate and additional valuation and assessment of a mineral leasehold that was not taxable in 1967.

land acquired by a local government after the lien date of the base year specified in this Section was assessed in the base year as part of a larger parcel, the assessed value of the part in the base year shall be that fraction of the assessed value of the larger parcel that *the area of the part is of the area of the larger parcel.*" (Italics added.) Since for the purpose of applying the Phillips factor this provision requires the proportion of a larger parcel acquired by a governmental agency subsequent to 1967 to be calculated based on the area of the property, it cannot apply to a mineral lease, which conveys simply a right to extract and cannot possibly be measured by its "area." (E.g., *Lynch, supra,* 164 Cal.App.3d at p. 102.)

Interpreting Section 11 as CCPA urges and the majority approves undermines the section's objective of "safeguard[ing] the tax revenues of smaller counties" (*San Francisco v. County of Alameda, supra,* 5 Cal.2d at p. 245) and is unnecessary to ensure fair valuation of the mineral rights. The geothermal mineral rights that are the subject of the present controversy were discovered, developed and put into production by private parties. When proved reserves were first established in 1982, taxes were thereafter paid annually on these leasehold interests, which appeared on the tax rolls independent of the ownership interests in the surface property. In the tax year preceding CCPA's purchase of these mineral rights, the property had an assessed value of $54 million. In CCPA's view, when it purchased the leasehold interests in 1992, Section 11 required the mineral rights to be revalued by applying the Phillips factor to their value in 1967—when they had no value and did not constitute taxable land. By treating the nonexistent rights as part of the land itself in 1967, the current assessed value of these rights was reduced to $404,025, virtually removing these valuable interests from the tax rolls of Sonoma. Indeed, $404,025 overstates the value of the mineral rights under the SBE's interpretation of Section 11. The SBE determined the value of the mineral rights by multiplying the Phillips factor times the 1967 assessed value of the *total parcel,* rather than times *the fraction of the total parcel that the mineral rights represent.* As pointed out above, this calculation does not follow the language of Section 11, which requires an apportionment based on the "area" of the mineral rights to the total parcel, and overstates the value of the mineral rights if 1967 is to be used as the base year for determining their value. CCPA does not challenge this calculation, undoubtedly for the strategic reason that doing so would require it to acknowledge that the SBE methodology does not, and cannot, comply with the strict letter of Section 11. But in all events this approach negates rather than assures the continuance of an adequate tax base related to these lands. The resulting tax on these rights is anything but comparable to the tax payable by private holders of the mineral rights. Moreover, such a result is at odds with the fundamental principle of article XIII, section 1 that all property be taxable.

Section 11 need not be interpreted in this manner to achieve its complementary objective. Ensuring that property is valued no higher in CCPA's hands than it would be in the hands of private owners does not require that the constitutional provision be interpreted to give CCPA such a windfall. By valuing the mineral rights at the time the proved reserves are first established, the base year value normally will be determined with reference to a period when the rights were in private hands, as would be true in this case. Thereafter, the Phillips factor can be applied to the base period valuation, just as the Proposition 13 index is applied to a base year valuation, and there will be no possibility of skewing the valuation to the prejudice of distant governmental agencies that subsequently may acquire the property rights.

The SBE considered *Lynch* and the line of cases that have followed it in applying Proposition 13 to mineral rights to provide no "legal authority to add subsequently proved reserves to a Section 11 valuation." As the SBE pointed out and the majority opinion reiterates, Proposition 13 is an "acquisition-value system of taxation." (*Lynch, supra,* 164 Cal.App.3d at p. 113.) The court in *Lynch, supra,* at page 116, did analogize the establishment of proved reserves to their "acquisition." Nonetheless, while Section 11 may not be acquisition-based in the same sense as Proposition 13, the difference between the two provisions in this respect is immaterial. Under Proposition 13, a base year value is established and the valuation in subsequent years is determined by applying an index to that base year value. The same is true under Section 11. While Proposition 13 contemplates that the base year will change when the property is acquired by a new owner and Section 11 does not, *Lynch* and the cases that followed it have involved no change of ownership. What was determinative in those cases is that applying the literal language of Proposition 13 to vagrant mineral rights regarded as part of the surface parcel would have produced an absurd and unintended result. The courts therefore interpreted the provision in a manner that achieved a sensible result consonant with the objectives of the proposition.[13]

---

[13] Since the language of Section 11 is ambiguous, there can be no dispute as to the appropriateness of this approach. (E.g., *Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 407 [267 Cal.Rptr. 589, 787 P.2d 996]; *Metropolitan Water Dist. v. Adams* (1948) 32 Cal.2d 620, 630 [197 P.2d 543].) "When, as here, language that appears unambiguous on its face is shown to have a latent ambiguity, customary rules of construction" call for an interpretation that gives as much effect to the language as possible but also "avoids the absurd and unfair result which would follow" if the section were interpreted literally. (*Stanton v. Panish* (1980) 28 Cal.3d 107, 115 [167 Cal.Rptr. 584, 615 P.2d 1372].)

However, even if one accepts the view that there is no ambiguity, the appropriateness of rejecting a literal interpretation that produces an absurd and unintended result in favor of a construction that is consistent with the objectives of the provision is firmly embedded in our jurisprudence. The so-called absurdity doctrine traces back to Roman law. (See Eskridge, *All About Words: Early Understandings of the "Judicial Power" in Statutory Interpretation, 1776–1806* (2001) 101 Colum. L.Rev. 999, 1000–1005 (Eskridge).) It was recognized and approved by Blackstone: "Where words bear either none, or very absurd signification, if

SBE has promulgated regulations that have overcome the valuation difficulties arising from the fluctuating nature of these rights, and used the existence of proved reserves to establish a base year value when such reserves did not exist in 1975–1976, the Proposition 13 base year. This same approach will work equally well in determining a base year value for taxable mineral rights that did not exist in 1967, the Section 11 base year. SBE's hyperbolic

---

literally understood, we must a little deviate from the received sense of them." (1 Blackstone, Commentaries on the Laws of England 59-61, as cited in Eskridge, *supra*, at p. 1003.) In the 1584 decision in *Heydon's Case* (Ex. 1584) 76 Eng. Rep. 637, 638, the court stated that "judges should make such construction as shall suppress mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief." (*Ibid.*, as cited in Eskridge, *supra*, at p. 1003.) The same principle has been recognized by the United States Supreme Court from its earliest decisions to those of the present day. (See Eskridge, *supra*, at pp. 1066–1087; e.g., *Wiscart v. Dauchy* (1796) 3 U.S. 321, 328–329 [1 L.Ed. 619, 3 Dall. 321] ["If . . . the construction . . . would amount to a denial of justice, would be oppressively injurious to individuals, or would be productive of any general mischief, I should then be disposed to resort to any other rational exposition of the law, which would not be attended with these deprecated consequences"]; *Holy Trinity Church v. United States* (1892) 143 U.S. 457, 460–461 [36 L.Ed. 226, 12 S.Ct. 511] [literal construction of statute rejected "so as to avoid absurdity" and achieve objective law designed to accomplish. "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter"]; *U.S. v. Amer. Trucking Ass'ns.* (1940) 310 U.S. 534, 543 [84 L.Ed. 1345, 60 S.Ct. 1059] [rejecting literal construction of statute "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' "]; *Public Citizen v. United States Department of Justice* (1989) 491 U.S. 440, 454 [105 L.Ed.2d 377, 109 S.Ct. 2558] [" 'Where the literal reading of a statutory term would 'compel an odd result,' ' courts must "search for other evidence of congressional intent to lend the term its proper scope"].)

The approach of the California Supreme Court has been no different. (E.g., *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on other ground in *Kowis v. Howard* (1992) 3 Cal.4th 888, 897–898 [12 Cal.Rptr.2d 728, 838 P.2d 250] [" ' "The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act" ' "]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281] ["California courts have held that constitutional and other enactments must receive a liberal, practical common sense construction which will meet changed conditions and the growing needs of the people"]; *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [28 Cal.Rptr.2d 638, 869 P.2d 1163] [same].) This commonsense approach has been embraced particularly where the circumstances creating the need for interpretation were not existent or apparent when the measure was adopted. (E.g., *People v. Belton* (1979) 23 Cal.3d 516, 525–526 [153 Cal.Rptr. 195, 591 P.2d 485] ["applying the basic principle that legislative intent prevails over literal construction," witness's prior out-of-court statement treated as "testimony" for purposes of Evidence Code section 1111; when the section was adopted in 1872, "the word 'testimony' was the term most precisely suited to expressing the Legislature's intent" but situation changed when Evidence Code section 1235 enacted in 1967]; cf. *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 635 [268 P.2d 723].)

assertion that this approach would "nullify" Section 11 is a gross overstatement. Section 11 would retain its same force with respect to traditional types of extraterritorial land, and with respect to mineral rights would establish a maximum valuation with reference to a date when the property interest was recognized for tax purposes. This would not, as the majority states, be the "repeal" of Section 11.

The method by which Sonoma applied its interpretation of Section 11 to CCPA's leasehold interests yielded an assessed value of $215 million—some four times greater than the values produced under the alternative method in Section 11 and under the Proposition 13 formula—which CCPA argues is itself absurd and demonstrates the fallacy of Sonoma's approach. However, because the SBE rejected any use of proved reserves to establish the value of mineral rights when applying the Phillips factor, it had no occasion to consider whether the method by which Sonoma did so was appropriate. This court is in no position in the first instance to evaluate the correctness of the method used by Sonoma. That is a task for the SBE. Given the constantly changing magnitude of CCPA's mineral rights, I do not minimize the difficulty of determining the precise method by which to calculate the base year valuation of such rights for the purpose of applying the Phillips factor. Regulations comparable to rules 468 and 473 may well be necessary. At this point, in my view, this court should simply hold that the method that was approved by the SBE and the superior court is not acceptable. In applying Section 11 to a leasehold interest conveying the right to extract geothermal energy, we should hold that the value of such an interest must be determined separately from the value of the surface property, and that the Phillips factor may not be applied to the value in a base year predating the existence of proved reserves.

The Phillips factor formula was designed to place a *ceiling* on the taxable value of extraterritorial property. The valuation produced by this formula need not be the lower of the two alternatives included in Section 11. And, under Proposition 13, the governmental agency receives the benefit of the lowest of three methods of valuation. (*San Francisco, supra,* 10 Cal.4th 554.) Given the valuations that appear in this record (a 1992 market value of $54 million versus a $48 million Proposition 13 value), there is little risk that by construing Section 11 as I have urged, governmental agencies would be taxed excessively or unfairly on their extraterritorial property. Even if the restricted valuation using the Phillips factor, properly calculated in conformance with SBE criteria, should be significantly higher than the other Section 11 alternative, Proposition 13 may well establish the operative ceiling, providing an additional guarantee that governmental agencies holding extraterritorial mineral rights are not taxed disproportionately on such holdings. (See *San Francisco, supra,* 10 Cal.4th at p. 570.)

In my view, the judgment should be reversed and the matter remanded to the superior court, with directions to vacate its judgment and issue a writ of mandate remanding the matter to the State Board of Equalization for further proceedings consistent with this opinion.

Appellant's petition for review by the Supreme Court was denied February 2, 2005. Kennard, J., and Chin, J., were of the opinion that the petition should be granted.